[No. 39675.    En Banc.    April 17, 1969.]

N. L. SMITH, *Appellant*, v. SKAGIT COUNTY *et al.*, *Respondents.*

EVAN NELSON *et al.*, *Appellants*, v. SKAGIT COUNTY *et al.*, *Respondents.**

*Reported in 453 P.2d 832.

*Hullin, Ehrlichman, Roberts & Hodge,* for appellants.

*Harry A. Follman, James G. Smith, K. R. St. Clair, Jones, Grey, Kehoe, Bayley, Hooper & Olsen,* and *Albert Olsen,* for respondents.

HALE, J.—Guemes Island is a quiet place. It has no industry or commerce, no hustle of traffic, no crime—and no police. The air above it is pure and sweet, and the waters

around it sparkling and clean. It lies at the eastern end of the San Juan archipelago—one of a group of inordinately beautiful islands. Its southern shore running nearly parallel to the mainland about 1 mile south at Anacorates, forms the north shore of Guemes Channel, a deep water body capable of carrying the largest ships afloat. Framed by inviting beaches, highlighted with open fields and wooded uplands, this beautiful island affords the residents there a peaceful pastoral haven for their homes and several beach and park areas for public recreation. When the Skagit County Commissioners, after years of intensive zoning study and planning, reserved Guemes Island for residential and recreational purposes only, they were simply recognizing what was universally accepted as the highest and best purposes for the use of the land.

The county commissioners now would make drastic and vital changes in the comprehensive zoning plan and interim zoning ordinance and maps, thus initiating this controversy. Very few people—even those who live on Guemes —question that the county needs more heavy industry, but the controversy swirls around the question of whether it shall be allowed on Guemes or kept within the presently zoned industrial districts, and whether a change of conditions has taken place recently which would warrant the county government drastically altering the existing zoning scheme to allow a large aluminum reduction plant on Guemes.

The main issues to be considered on appeal—although we see several others—are whether, in amending the comprehensive plan, interim zoning maps and ordinance in order to zone a large waterfront tract on the south shore for heavy industry, the hearings and procedural steps taken to accomplish the rezoning meet the basic requirements of fairness and due process demanded by the zoning statutes and whether the rezoning constituted an illegal spot zoning. The question of fairness in a public hearing unfortunately, we think, cannot be resolved with reasonable clarity without first making a detailed account of the actions which led originally to zoning Guemes Island exclusively residential-

recreational, and comparing them to the procedures which culminated in the industrial zoning now under attack. The magnitude and complexity of the original zoning studies, when contrasted with what appears to us to be the summary and hurried steps taken to rezone the island, make clear that the public hearing failed to meet the measures of fairness required by law.

Petitioners brought a petition in superior court for a writ of certiorari or, in the alternative, a writ of prohibition to bar the planning commission and Board of Commissioners of Skagit County from rezoning a tract of land on Guemes Island from wholly residential-recreational to industrial. From a judgment denying the petition, comes this appeal. The learned trial judge has favored the record with a memorandum opinion which, however helpful, inevitably raises a subsidiary question. Do we examine the record de novo, or are we largely confined to an assessment of asserted errors? A review of the whole record de novo, we believe, is required for this case is quite typical of most appeals from the granting or denying of extraordinary writs.

Usually, appeals from rulings in certiorari, mandamus and prohibition give the reviewing court much the same view of the record as that of the trial court, and this appeal is no exception. Thus, although the conclusions of the learned trial judge are entitled to the most careful consideration, where the record both at trial and on appeal consists entirely of written and graphic material—documents, reports, maps, charts, official data and the like—and the trial court has not seen nor heard testimony requiring it to assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence, then on appeal a court of review stands in the same position as the trial court in looking at the facts of the case and should review the record de novo. We should, therefore, give the record an independent review.

On this point, in *Carlson v. Bellevue*, 73 Wn.2d 41, 435 P.2d 957 (1968), we said:

The appeal, therefore, from the trial court's judgment brings before us, in the same form and content, the identi-

cal documents and records presented to the trial court. Under these circumstances, we are not bound by disputed findings of the trial court to the same extent and in the same manner as where the trial court's findings rest upon the oral testimony of witnesses. *State ex rel. Pac. Fruit & Produce Co. v. Superior Court*, 22 Wn.2d 327, 155 P.2d 1005 (1945); *In re Black*, 47 Wn.2d 42, 287 P.2d 96 (1955); *Nygaard v. Department of Labor & Indus.*, 51 Wn.2d 659, 321 P.2d 257 (1958); *Chalmers v. Department of Labor & Indus.*, 72 Wn.2d 595, 434 P.2d 720 (1967). We are entitled to make our own examination of the records thus presented and determine the merits of the contentions going to the issue of arbitrary, capricious, and unreasonable legislative action.

*Accord: Bishop v. Town of Houghton*, 69 Wn.2d 786, 420 P.2d 368 (1966).

A de novo look at this record, we think, shows not only that the board of county commissioners rezoned the aluminum company's optioned property without affording the fair and dispassionate hearing contemplated by the zoning statutes, but that they *spot zoned* the area for the particular benefit of a particular applicant and against the public interest and that, as a spot zoning, this in itself was unreasonable, arbitrary, capricious and, therefore, illegal.

PHASE I—PRELIMINARY ZONING STUDIES

Skagit County's resolve to zone Guemes for residential and recreational uses came about through long, careful and detailed studies officially made under law. In contrast to the abrupt rezoning in issue, they were painstakingly thorough and deliberate. Initiating officially what undoubtedly had been preceded by informal studies, the Board of County Commissioners for Skagit County, July 24, 1961, in resolution No. 3678, established a planning department under RCW 36.70, and created a planning commission of nine members as a component of that department. The resolution directed that the planning commission "shall conduct such hearings as are required" under the statutes, and make findings of fact and conclusions therefrom for transmittal to the department of planning which, in turn, should refer the same to the county commissioners with

720

appropriate comments. and. recommendations. Section 5 of the resolution created the office of director of planning to head the department.

A short time thereafter, the planning department engaged M. G. Poole & Associates, a firm of professional planners, and consultants, to start the studies, surveys and work preliminary to the preparation of a comprehensive zoning scheme for Skagit County. Nearly 2 years later, in May, 1963, M. G. Poole & Associates prepared and delivered to the county commissioners a 51-page report in booklet form entitled "Regional Planning in Skagit County."[1]

This document, as will be seen, was professional in concept and scientific in execution. It officially laid the foundation for the zoning of Skagit County, supplying the basic information for the ultimate county-wide comprehensive plan, zoning ordinance and zoning maps. It furnished the facts without which no sensible zoning could be accomplished; it described the county as to topography—depicting its composition of mountains, lowlands, forests, marshes, rivers, lakes and bays. It reported that the county had 160 square miles of lowland and river land, with the rest of the county predominantly forested and mountainous. Regional Planning in Skagit County showed that only 15.8 per cent of the county's total land mass could be called livable and that 1,462 square miles would have to be classified as non-livable.

Through various tables, the report showed that, in addition to the low river lands of some 160 square miles, other areas brought the total livable lands within the county up to 273 square miles. Concerning this 273 square miles of livable lands, the report said 10.1 square miles of it were then occupied for residential purposes, 3.6 square miles for industrial purposes, .63 square miles for commercial uses

[1]An acknowledgment on the frontispiece of the booklet said that the Poole & Associate "report was prepared under the general supervision of the Washington State Department of Commerce & Economic Development, and was financed in part through an urban planning grant from Housing & Home Finance Agency, under the provisions of section 701 of the Housing Act of 1954."

and 183.7 square miles were vacant. From these 183.7 square miles of vacant livable lands, along with those existing areas already in use but which were susceptible of increased density without crowding, would come the residential, recreational, agricultural, commercial and industrial districts for future growth. The report had for its stated purpose the *objective to provide for the highest and best use of the land, in the public interest* and to *conserve, in so far as is possible, our original natural environment* and *to develop and to protect neighborhoods in existing and future residential areas* (Italics ours.) and *to group together similar land uses and to prevent mixed land uses.*

Maps, charts, tables and text of the regional report set forth policies, goals and methods to be used in a sound planning program. It gave detailed population figures and projected these into the future; it made recommendation for the space and locations to be reserved for future elementary, intermediate and high schools. It included recommendation for the location, width and kind of roads, streets and highways. In short, regional planning presented a detailed factual study of Skagit County's topographical, economic, social and demographic makeup upon which the next steps could rest as Skagit County moved forward under RCW 36.70 to a zoning plan. Nothing in this study suggested or implied that Guemes Island be zoned other than residential, or that zoning of island areas then reserved for recreational purposes as a public saltwater park be altered to allow a different use.

PHASE II—ZONING GUEMES ISLAND RESIDENTIAL

After delivering "Regional Planning in Skagit County," M. G. Poole & Associates continued their studies, and in logical sequence submitted next to the county commissioners in February, 1965, a comprehensive zoning plan for Skagit County. With its appendix, the plan laid out highly detailed information and reports, covering all of Skagit County and depicted the recommended uses for which the land within it should be reserved, declaring that the plan,

as proposed, had been devised to carry out the following basic objectives:

[T]o promote a coordinated development of the undeveloped areas in this County

[T]o prevent and eliminate the pollution of air, soil and water in this County

[T]o coordinate with the long range plans of other government agencies in this region

*[T]o develop and protect neighborhoods in existing and future residential areas*

[T]o provide for the highest and best use, in the public interest, of the land in Skagit County.

(Italics ours.)

As with the earlier regional planning report, the comprehensive plan was neither casual nor perfunctory, but represented the results of a deep study of the whole county, including its economic and social needs. In short, the comprehensive plan set forth just about everything essential for establishing a county-wide zoning law. Among other things, it depicted the population densities by areas, rates of growth and migrations, and forecasted population trends. It said that between 1960 and 1985, the county would have an increase of 36,000 people, represented by an additional 11,500 households—the great majority of whom would reside in single-family dwellings, with few in apartments. The total increase in population would directly foster an increase in the labor force, along with an expansion of existing and development of new industries. The comprehensive plan showed population density patterns, traffic patterns, recreation areas, and described the suitable land use for various parts of the county. Again, as in the regional planning report, Guemes Island was designated exclusively for residential and outdoor recreational purposes with not the least hint that a zone for heavy industry be allowed there.

Drawing thus upon a wealth of factual data, the comprehensive plan set forth the conclusion that "there is adequate land, resources, cheap electric power, and pure water to insure a strong potential for economic growth." It also designated several areas available for industrial growth and

expansion, and warned against pollution of land, air and water.

Supporting its observations with maps, charts and tables, the plan stated that industry occupied 6 per cent of the land within incorporated cities and towns and 7 per cent of the fringe areas near the outer boundaries, and that vacant land accounted for one-fourth of the areas within incorporated limits and three-fourths of the land in rural districts.

The county commissioners now had before them specific proposals to present to the people, a program vitally affecting every parcel of land in the county. They called for and gave notice of a series of public meetings to be held in different places in the county, inviting the comments, information and arguments concerning the adoption, rejection or amendment of the proposed comprehensive plan.

The meetings which followed considered the advisability of adopting, rejecting or amending the proposed comprehensive plan and enacting zoning resolutions pertaining to it. Of apparent concern to everyone was ascertaining which areas should be zoned for industrial uses and which should be preserved for residential. Minutes of a public meeting of February 23, 1966, for example, concerning the comprehensive plan, consisting of five and one-half double-spaced, legal size, typewritten pages, devoted two and one-half pages exclusively to industrial zoning and one-half of another page reflected concern for the same subject. The board, the planning commission and the public, it is thus seen, had the question of industrial zoning foremost in mind and had devoted great effort and thought to a broad but detailed study of the needs and requirements of industry and future industrial expansion. Never, in all of these proceedings and studies, is there found even a remote suggestion that Guemes be industrial in the slightest degree, or be zoned other than residential and recreational.

The minutes of a public meeting of the planning commission held on the evening of April 4, 1966, again show that the topic of industrial sites was a prominent topic of

concern, the subject being discussed on the floor several times. At the end of the discussion, the planning commission by resolution approved the proposed comprehensive plan and recommended that the county commissioners adopt it along with an interim zoning ordinance. Next day, at a public meeting, the Board of County Commissioners of Skagit County, in open session, by resolution, approved and adopted the comprehensive plan, consisting of the "map, objectives, standards, and policies as set forth in the text, and the land use map" all of which designed Guemes Island as residential and recreational.

Then, on April 12, 1966, the Skagit County Commissioners conducted a public hearing to consider a county interim zoning ordinance contemplated by RCW 36.70.790 to effectuate the comprehensive plan. Minutes of that meeting show that several persons present exhibited genuine concern about industrial zoning. One of the commissioners assured the meeting that "it was their intention . . . to allow a buffer zone between residential and industrial sites." According to the minutes of that meeting, other persons asked repeatedly from the floor why it was necessary to industrialize the Bayview area. Mr. Kite, the county planning director, answered that M. G. Poole, planning consultant, had selected the area as best suited for land-based industry—contributing factors being its proximity to the airport, transportation facilities and utilities. Others protested the future industrialization of the Padilla Bay and Bayview Ridge areas.

Again and again during the meeting, the question of industrial zoning came up, and the areas designated by the maps and comprehensive plan for future industrial expansion were considered by the commissioners. Thereupon, the board of county commissioners, pursuant to RCW 36.70.790, enacted the Skagit County Interim Zoning Ordinance, which contemplated that Guemes Island be zoned residential-recreational and the areas set aside by official maps and text of the comprehensive plan for existing industry and future industrial expansion remain so.

The term *interim,* used to describe an *interim* zoning ordinance (RCW 36.70.790), is something of a misnomer when applied to the Skagit County resolution of April 12, 1966, for its adoption represented the near completion of a zoning scheme for Skagit County. It was designed to afford "broad protective controls . ·. ·. until such reasonable time as a detailed zoning map and detailed regulations" were established in *"accordance with·the Comprehensive Plan."* (Italics ours.) The ordinance adopted "the official Interim Zoning Map" and all explanatory matter connected with it.

This zoning ordinance was no casual stopgap regulation, but rather a detailed zoning code enacted pursuant to statute (RCW 36.70.750), regulating the use of buildings and structures and fixing the use in accordance with the comprehensive plan and interim zoning maps. It required conditional use permits for some uses such as excavating, incinerating, automobile wrecking, outdoor theaters, bowling alleys, and industrial enterprises creating obnoxious odors, noises, smoke, unsightliness, or which involved explosives. It prescribed by mathematical formula minimal lot sizes for single, double and multifamily dwelling units and for public, commercial and industrial buildings. For example, the interim zoning ordinance required a minimum of 25 feet offset at the front for residential construction on ordinary streets and 35 feet on arterials. The interim zoning ordinance prohibited nonconforming uses, exempted buildings under actual construction, and established a board of adjustment to hear and decide upon the granting or denial of conditional uses, the issuance of building permits, and the allowance of variances. In brief, the interim zoning ordinance in seven and one-half legal-sized pages of single-spaced typewriting set forth a detailed zoning code for Skagit County.

Further evidence of the care and deliberation taken in effecting an interim zoning ordinance is seen in the adoption October 25, 1966, of an amendment thereto again fixing minimum lot widths and side and front offsets for building sites and requiring at least 10 offstreet parking spaces for

new or remodeled commercial buildings. No where, and at no time throughout the elaborate, detailed and studied proceedings, beginning with the initial planning in 1961 and on through the preliminary planning and continuing into the regional plan, the adoption of a comprehensive plan and interim maps, and culminating with the enactment of an interim zoning ordinance and the amendment to it in October, 1966, has Guemes Island been either zoned or described as other than a residential-recreational area.

The record is barren of any indication that anyone ever suggested officially or unofficially, directly or indirectly, throughout the whole, long, drawn-out proceedings that any part of the island be zoned for industrial uses. Thus, the island's status in the ultimate zoning scheme as a residential district had been arrived at as a result of numerous public hearings, public discussions and controversies, official deliberations, study and planning, running over a period of some 5 years, culminating at last in openly arrived at and lawfully enacted legislation by the legislative body for Skagit County, the board of county commissioners.

PHASE III—ZONING AN AREA OF GUEMES ISLAND INDUSTRIAL

There then took place in quick sequence a series of events which gave rise to this suit. The Northwest Aluminum Company of New York, in a document dated September 14, 1966, designated as an "Application and Petition for Reclassification of Zoning District" submitted to the Skagit County Commissioners a request to rezone from residential to industrial a large tract of waterfront land fronting on the south shore of Guemes Island. The application showed that the company had options to purchase the land, and according to the application, if a rezoning were accomplished, the company intended to construct a large aluminum reduction plant on the south shore of the island.

The application recited that the company needed a 700-acre site and that its plant would consist of four main potline buildings, other structures for supporting activities, and a ship dock. It would operate 24 hours a day, 365 days

a year, but the site was large enough to allow a buffer zone between the plant buildings and adjoining property. An outline of technological steps and procedures to curtail air, water and soil pollution was set forth in the document. From the exhibits and descriptions in the application, we would estimate that the site would occupy more than 7,000 feet of waterfront land and in excess of 1½ miles of beach line along the south shore of Guemes.

The Skagit County planning commission, pursuant to statute, gave public notice of and then, on October 24, 1966, held a public meeting to consider the aluminum company's application, scheduling the program so that proponents of the rezoning should speak first and opponents later in the session. Just before the noon recess, Mr. Ehrlichman, attorney for a group of persons opposing the aluminum company's proposal, briefly commented that he was appearing on their behalf. The tenor of his remarks apparently related to matters known to most everyone present and suggested an understanding that counsel would be allowed ample time and opportunity later—all within contemplation of a court order then on file.

The hearing of October 24 before the planning commission was continued to and resumed November 7. According to the record, the announced purpose of the meeting was to decide whether the planning commission should amend the comprehensive plan, land use map, interim zoning map and interim zoning ordinance No. 4081 so as to allow a heavy industry on Guemes Island. Mr. Kite, the director of the Skagit County planning department, spoke in favor of the proposed changes.

Following a review of the reasons for the rezoning by its advocates, Mr. Ehrlichman was given the floor to present argument and evidence in opposition. Marshaling some of the more cogent arguments against rezoning, Mr. Ehrlichman pointed out that less than 1 month earlier the planning commission had authorized one of the owners of the tract adjacent to the aluminum company's proposed site to build a number of single-family residences there; that the com-

prehensive plan and interim zoning ordinance already provided great areas for industrial expansion in the Anacortes area, at March Point and east of March Point; that other areas already available for industry and its expansion had been reserved on the Swinomish Indian Reservation and the Bayview Airport area. Mr. Ehrlichman referred to a letter from Mr. Poole, of M. G. Poole & Associates who prepared the comprehensive plan for the area, which said that "Guemes Island does not meet the criteria for an industrial area." He showed pictures of an industrial development in the March Point industrial zone with a pier running to deep water and urged that nothing in the comprehensive plan and interim zoning ordinance prevented the Northwest Aluminum Company, except the costs of development, from locating its reduction plant on land already zoned for heavy industry.

On this point, Mr. Ehrlichman referred to expert opinion that the preservation of good residential and recreational areas means that industry must develop for its use—even at added costs—available areas not suited for other land uses, because areas of natural beauty or those best suited for residential or recreational purposes, once taken by industry, will not, within the foreseeable future, ever be restored, whereas industry through modern engineering and technology can utilize the areas already zoned for it.

From a reading of a stenographic transcript of this public meeting which was attended by between 400 and 500 persons, it appears that the following points were advanced in favor of rezoning Guemes Island to allow the aluminum company to build a reduction plant there:

1. Technological and social changes warrant rezoning from residential to industrial.

2. Adequate controls can be enforced by the county and state to prevent air, water and soil pollution. The company will remove at least 99 per cent of all fluorides and hydrogen fluoride from the air fallout.

3. A labor surplus exists in Skagit County; the county needs jobs.

4. The proposed site is large enough to and will avoid harm to adjoining and nearby residential and recreational uses.

5. The new site will provide deep-water facilities capable of handling the largest ships afloat.

6. The plant buildings will occupy only 50 of the proposed 700 acres (later cut to 400 acres). There will be ample space for a green belt buffer around the perimeter.

7. The plant will represent a large capital investment—probably more than $150,000 per employee—thereby giving a good economic boost to the area.

8. Other aluminum reduction plants using a similar process such as Aluminum Smelter at Badin, North Carolina; ALCOA plant at Warwick, Indiana; ALCOA plant at Point Comfort, Texas; ALCOA plant at Geelong, Australia; Aluminas Mexicana plant at Vera Cruz, Mexico; and Alcan plant at Arvida, Canada, operate with no deleterious air, water and soil pollution.

9. Construction employment alone will provide jobs for several years.

10. This large new industry will enlarge the tax base in support of public schools in Skagit County, and will permit a reduction in annual school levies and general taxes while providing revenue for an increase in students and an improvement in education.

11. The Shell Oil Company, 10 years earlier, in locating its refinery on the March Point industrial area, faced many of the same objections, but now pays $535,000 annually in county taxes and represents a great civic asset.

12. The beaches on Guemes are mostly privately owned, and the public is, therefore, unable to enjoy them.

13. The building and operation of the Texaco Oil Refinery at March Point has likewise proved to be a community asset.

Opponents of the aluminum company's application to rezone Guemes Island urged:

1. They do not oppose but welcome industry to Skagit County, provided it locates on sites suitable for the purpose; there now exists under the comprehensive plan and

interim zoning maps and ordinance many fine industrial sites already zoned and available for industrial expansion.

2. When the time comes, and existing industrial zones are inadequate for new or expanding industries, the logical and natural course is to provide them by rezoning adjacent and contiguous areas.

3. The standards and controls to preclude air, water and soil pollution are so loosely drawn as to be unenforceable; they are illusory and ineffectual, as evidenced by noxious smells emanating from industries in Tacoma and Everett.

4. If effective and enforceable antipollution controls were enacted before Northwest Aluminum began construction, there is no assurance it would complete the project.

5. Once a large industry has commenced operations, its promises cannot be enforced, and it cannot be closed down because the community becomes dependent upon it for tax revenues, jobs, and as a local customer and civic benefactor.

6. Advance publicity concerning the location of a Shell refinery in Anacortes claimed the company would employ 1,500 persons, whereas its actual employment is about 450 persons. Texaco employs not more than 260.

7. The two oil companies which promised that their refineries would not pollute the air have failed to keep these promises, and a heavy pall of smog now frequently hangs over Anacortes which was not there before the arrival of the two refineries.

8. Northwest Aluminum Company would not be limited as to the height of buildings it could erect on Guemes Island.

9. There now exist on Guemes Island publicly owned beaches and a public waterfront park which are very busy in the summertime and are owned by the city of Anacortes.

10. There is in operation on the island a privately owned recreational resort which brings tourist money and commerce to Anacortes and vicinity.

11. There are other publicly owned areas on the island available for future expansion of recreational facilities.

12. Less than 1 month earlier, the Skagit County planning commission had confirmed its long-held position that

no industry be allowed on Guemes by authorizing owners of property adjoining the Northwest Aluminum Company's proposed site to develop their land for the construction and sale of single-family residences.

13. Included in the proposed industrial zone are a community center, a schoolhouse and a church—all in active use.

14. The comprehensive plan, interim zoning maps and ordinance, adopted in April, 1966, after years of public hearings, discussion and studies, could not become obsolete so quickly; the only change shown was not a change in condition but merely the aluminum company's desire to build a plant there.

15. The expected reduction in taxes with the arrival of two oil refineries never materialized, and for some unknown reason taxes have trebled in 10 years.

16. The Northwest Aluminum Company has impliedly threatened that, unless the county rezones Guemes Island to suit its purposes, the company will not locate in Skagit County because no other site will be acceptable. If this be the basis for rezoning, every comprehensive plan could readily be destroyed by such threats from any large corporation.

17. Skagit County has an abundance of deep water sites already zoned for industrial purposes, and piers are already planned for construction on the existing March Point site.

18. Mislocating heavy industry reduces other land values, and the long-term damage will outweigh the temporary benefits derived from a large, heavy industrial operation. Converting one-fifth of Guemes Island to heavy industry as planned will ultimately change most of the island from a residential-recreational area to an industrial zone.

19. No matter how carefully planned and operated, heavy industry will inevitably disturb the surrounding scenic, recreational and residential attributes of the district.

20. Under existing zoning regulations now acceptable to the company, its largest structure could legally be located within 200 feet of adjoining residential property, and there

are no controls in effect against noise, lights, glare, vibration and dust during a contemplated night-and-day operation.

21. The proposed plant will operate gigantic blowers and railroad locomotives night and day on the proposed 700-acre site.

22. The blower systems will discharge into the air 53.96 pounds of fluoride per day and 19,695 pounds per year, plus 52,597 pounds of hydrogen fluoride per year—even if the air pollution control systems operate at an efficiency of 99 per cent.

23. The concentration of people in a large industrial plant will require the construction and operation of a large sewage treatment plant on Guemes.

24. Answering the proponents' arguments that other companies had located aluminum reduction plants elsewhere without harmful effects upon the adjoining areas, opponents said:

(A) A similarly operated plant at Warwick, Indiana, is located on a 6,000-acre tract—a site larger than all of Guemes Island.

(B) A plant in Quebec, Canada, is situated on a company-owned tract having a $3\frac{1}{2}$ mile radius.

(C) Alcan has bought up easements to radii of 4 to 10 miles from one of its plants to obviate damage claims.

(D) The opponents need more time to check on plants operated elsewhere.

(E) With fluctuations in the demand for aluminum, the plant may be closed for long periods, leaving widespread unemployment, increased welfare costs and attendant social problems.

25. When an area becomes industrial, taxes on all adjoining property rise, forcing sale of the land for industrial purposes, and, thus, the whole area becomes industrial.

We have summarized the arguments and contentions of those supporting and those opposing the rezoning to demonstrate that the public hearing prescribed by statute is not

a mere matter, of form but is rather an integral part of the legislative process required by statute of planning commissions and county commissioners in considering zoning regulations. The public hearings, therefore, must not only be fairly undertaken in a genuine effort to ascertain the wiser legislative course to pursue, but must also *appear* to be done for that purpose. In short, when the law which calls for public hearings gives the public not only the right to attend but the right to be heard as well, the hearings must not only be fair but must *appear* to be so. It is a situation where appearances are quite as important as substance.

Toward the end of the hearing, Mr. Ehrlichman, in speaking against the rezoning, said:

> They have told you that they must have deep water, and you know from the maps, from the pictures, from what you know of your own county, that there are deep-water sites. I might ask, has this Commission had the benefit of an examination of the Bonneville Power Administration industrial site study that Mr. Rooks referred to? Are any of you familiar with it?

> Let the record show that there is no answer. Therefore, as Exhibit 5, I would like to file it.

to which the chairman of the planning commission replied:

> MR. JOHNSON: Let the record show that the Planning Commission is not answering any questions today of you or anyone else.

Now, the question thus put was in no sense merely rhetorical or propounded in an effort to bedevil or confound the commission, but a relevant query concerning the steps the Bonneville Power Administration would take to effectively enforce a pollution control procedure as a condition to furnishing uninterrupted power to Northwest Aluminum. The public was entitled to know the extent to which a powerful agency of the United States would intervene in the prevention of air and water pollution. On this point, it will later be seen that representatives of Bonneville and the Northwest Aluminum met in closed session with the planning commission at which the public and opponents of the plan were excluded.

Before adjournment, on a different subject, the chief executive officer of Northwest Aluminum Company, answering assertions that deterioration of the aluminum market might cause the company to close down, said this would not occur in the foreseeable future because the company has a firm contract for the sale of its aluminum output. For the first time, he publicly identified the company as follows:

The parent company of Northwest Aluminum is Bell Intercontinental, which in turn is controlled approximately 51% by the Equity Corporation, which in turn is controlled by American Export Isbrandtsen Lines, which operate quite a few freighters, and we think we are getting reasonably good advice on docks and sites, boats, etc.

The combined net worth of these companies is something over $200 million. We have a pay contract on the output of the plant, so the concern the plant might not operate if the aluminum industry as a whole suffers competitively would not be a concern for this particular facility.

### WERE THE PUBLIC HEARINGS FAIR?

At the close of the meeting, the chairman of the planning commission announced:

MR. JOHNSON: Having heard from all the persons desiring to speak, this public hearing is terminated. The public meeting is recessed until 10:00 A.M., Monday, November 14, here at the Moose Lodge, at which time we will either announce our decision or again continue to a date certain. We will be in executive session in the interim to consider all the evidence that has been presented.

This announcement, we think, unmistakably conveyed the idea that the commission was retiring to deliberate upon its decision, relying only upon its legally constituted staff to aid it in formulating its judgment and to express it in words, graphs, charts and pictures. The announcement conveyed the idea that public meetings were ended and implied that all of the evidence, debate, argument and cajolery were, for the time being at least, at an end.

The record does not show what next transpired. It is known, however, that the public meeting recessed pursuant

to the above announcement, reconvened at 10 a.m., Monday, November 14, and remained in session for about 1 hour. Thereupon, at 11, the planning commission met in closed session but with representatives of the Northwest Aluminum Company, an avowed advocate, and the Bonneville Power Administration, a likely proponent of the company's proposal, invited to participate in a discussion of air pollution and such other matters as might arise. There is no reason to doubt that all of the opponents of the rezoning were deliberately excluded from this so-called executive session.

Minutes of this executive or closed session of the planning commission state that "Legal counsel advised that the executive session was for an opportunity of free expression and discussion without having to go on record." Among those present were Mr. Morris of Strike & Company, a firm engaged by Northwest Aluminum Company to advance its cause. The minutes of that meeting reflect generally that Mr. Morris presented considerable data and argument on air pollution favorable to the aluminum company's position and apparently answered in private the contentions of his adversary advanced publicly at the open meeting. He also covered many other points of contention which had been discussed at the earlier open meeting and, according to the minutes, "emphasized the good intentions of the company in providing funds and equipment" for pollution control.

This closed meeting recessed at noon and, when it reconvened still in closed session, according to the minutes:

> pictures of the proposed plant were circulated to members of the Commission with comments from Mr. Morris relative to the setback of buildings, general landscaping and pertinent details.

and the minutes conclude:

> Referring to Dr. Milton Meissner's letter of October 26, 1966, addressed to the Board of County Commissioners, considerable discussion was devoted to what might be the extent of the participation of the aluminum company in connection with the ferry service between Anacortes and Guemes Island and related details.

Discussion took place regarding operation of the Troutdale, Oregon and Vancouver, Washington, aluminum plants and pictures of them and the surrounding areas were studied.

Mr. Morris described the shipping activities in connection with the operations of the proposed plant.

General discussion took place relative to basic aspects of planning and zoning.

The meeting was adjourned.

As has been observed, the foregoing closed meeting began at 11 a.m., November 14, 1966, only a few minutes after the public meeting held by the planning commission had adjourned. No opponents of the rezoning proposal were allowed at that closed meeting and the evidence, arguments and advocacy presented to the planning commission in camera were made public only through minutes of a broad general character and then only pursuant to a court order.

About 4 days later, without further public hearings, the planning commission on a five to two vote recommended to the county commissioners that 480 acres of Guemes Island waterfront tract be rezoned from residential-recreational to industrial to accommodate the Northwest Aluminum Company's request, and also by a five to two vote that the comprehensive map and interim zoning map be altered to permit Northwest Aluminum Company to build its aluminum reduction plant there. Then, with no further public hearings or any public reference to the matters considered at the executive session and without any invitation to the opponents to refute, answer or comment upon matters presented at the closed meeting, the planning commission, on November 18, made a written recommendation to the county commissioners to grant the aluminum company's application and adopt the rezoning.

At an open meeting convened November 29, 1966, at the Skagit County Courthouse, the board of county commissioners met for the purpose as announced by the chairman:

CHAIRMAN: As Chairman of the Board I am reconvening our Board in regular session at this time for the purpose of considering the recommendations of the Plan-

ning Commission under date of November 18, 1966, relative to rezoning of a part of Guemes Island and amending the interim zoning ordinance number 4081.

Our Commission having fully considered this matter, at this time I will entertain a motion for the portion of the recommendation relative to the interim zoning ordinance.

Without calling for comments, objections or any discussion, either among the commissioners or from the public, the following occurred:

CHAIRMAN: It has been moved and seconded that the recommendation of the Planning Commission relative to amending the Interim Zoning Ordinance be passed. Those in favor say aye.

(All members stated "aye.")

Whereupon, according to the record of that meeting, a Mr. Heilman, an active opponent of the rezoning, said:

SPECTATOR: Mr. Chairman, as you recall last Tuesday I appeared before the three of you and asked about the public hearing for this meeting and you told me that it would be advertised and the date announced. Now I find out that there is no such meeting and I am also denied the privilege of speaking before this body.

CHAIRMAN: Mr. Heilman, you were in attendance at our meeting last Tuesday in company with others and it was indicated that at the time that you had a spokesman. I was advised this morning that Mr. Welts was going to represent the group that was in attendance at our meeting. You didn't ask to present testimony today and you are not permitted to do so at this time.

MR. HEILMAN: May I correct something? I was not in attendance with anybody. I was there at 10:00 o'clock and the rest of the group were not there and I would have asked permission to speak had I known that you were having this kind of a meeting.

MR. WELTS: To clear your record, I don't represent this gentleman. He is not one of—

MR. HEILMAN: I'm speaking as a private citizen.

CHAIRMAN: You did not ask to be heard this morning or prior to the meeting, did you?

MR. HEILMAN: I supposed I would have a chance this afternoon to ask permission to speak.

CHAIRMAN· It was announced early this morning that those who had asked to present testimony could do so this morning.

MR. HEILMAN: You mentioned three people. You didn't mention me or anybody else from the audience.

CHAIRMAN: Regarding your statement, Mr. Heilman, about publicizing a public hearing, we advised you at that time and I will so advise you at this time this is not a public hearing period. We are not obligated to call a public hearing on this particular matter.

MR. HEILMAN: Why did you give me that impression?

CHAIRMAN: I didn't. You misunderstood me, sir.

MR. HEILMAN: I very much must have misunderstood you.

CHAIRMAN: Yes, you did, because we had no intention of publicizing this. As a matter of fact, we set the date for this public meeting at which time we would consider these recommendations.

MR. HEILMAN: Why didn't you tell me that in the morning?

CHAIRMAN: We hadn't set the meeting in the morning but we gave you no impression that we would call a public hearing on this because we had no intention of doing so.

MR. HEILMAN: You said it would be advertised.

CHAIRMAN: I will ask you, please to—

MR. HEILMAN: This misunderstanding—

CHAIRMAN: I'm sorry, you are not at liberty to present testimony at this period of our regular meeting.

County planning takes place under the auspices of RCW 36.70, as distinguished from city planning under RCW 35.63, which latter applies in some degree to both cities and counties but specially cities.

In county planning, preparation of a comprehensive plan is the beginning and indispensable precursor to a county zoning law (RCW 36.70.020(6)), and must be certified as a comprehensive plan after public hearings. RCW 36.70.320. There is nothing casual, or perfunctory, about a certified comprehensive plan as the statutes require it to set forth a number of specific elements (RCW 36.70.330), and it

serves as a guide to the later development and adoption of official zoning controls. RCW 36.70.340. Its adoption must be preceded by at least one public hearing. RCW 36.70.380.

"When changed conditions or further studies by the planning agency indicate a need, the commission may amend, extend or add to all or part of the comprehensive plan . . ." RCW 36.70.410.

Whenever the board of county commissioners has certified a comprehensive plan, no new streets shall be opened or old ones vacated within areas covered by the comprehensive plan unless submitted to and reported upon by the planning agency. RCW 36.70.540. Zoning may be achieved by adoption of official zoning maps (RCW 36.70.720), or by text without zoning maps (RCW 36.70.730), or by both maps and text. RCW 36.70.750.

■ An interim zoning may be accomplished through adoption by the board of county commissioners of an interim zoning map and ordinance which shall serve to classify or regulate the use of land when warranted as an emergency measure to safeguard the public welfare pending completion of the zoning scheme and as a safeguard against manipulation of land uses in contemplation of a final zoning law. Interim zoning is no mere stopgap, but rather is a deliberate and purposeful device designed to *classify* or regulate uses of land and related matters (RCW 36.70.790), and is necessary to preserve the zoning scheme as presented to the public in the comprehensive plan and attendant maps and resolutions or ordinances.

■ Before recommending to the board of county commissioners any amendments to the comprehensive plan or to the interim zoning ordinance and maps, the planning commission was obliged to hold "at least one public hearing." RCW 36.70.380, 36.70.580. It is axiomatic that, whenever the law requires a hearing of any sort as a condition precedent to the power to proceed, it means a fair hearing, a hearing not only fair in substance, but fair in appearance as well. A public hearing, if the public is entitled by law to participate, means then a fair and impartial hearing. When

applied to zoning, it means an opportunity for interested persons to appear and express their views regarding proposed zoning legislation. *Schlagheck v. Winterfeld,* 108 Ohio App. 299, 161 N.E.2d 498 (1958); *Braden v. Much,* 403 Ill. 507, 87 N.E.2d 620 (1949). The term "public hearing" then presupposes that all matters upon which public notice has been given and on which public comment has been invited will be open to public discussion, and that persons present in response to the public notice will be afforded reasonable opportunity to present their views, consistent, of course, with the time and space available. Where the law expressly gives the public a right to be heard—as distinguished from open sessions of the Congress or state legislatures or lesser legislative bodies which, although conducting their session in public, need not as a matter of law allow public participation—the public hearing must, to be valid, meet the test of fundamental fairness, for the right to be heard imports a reasonable expectation of being heeded. Just as a hearing fair in appearance but unfair in substance is no fair hearing, so neither is a hearing fair in substance but appearing to be unfair.

Of course, the law affords many kinds and types of public hearings—each relevant to the work and purposes of the body or organ of government required to hold it. The open hearings which most scrupulously and painstakingly afford due process of law are the trials or appeals on issues conducted by the judiciary on precisely framed issues. Other kinds include hearings before administrative agencies, boards and commissions, hearings before officers of the executive branch, and legislative hearings. In some of these the public may be present with no right to be heard, and in others the public has a right not only to be present but, additionally, to be heard and to influence the result.

■ Unlike a judicial hearing where issues of fact should be resolved from the evidence only without regard to the private views of the judges, a legislative hearing may reach a decision in part from the legislator's personal predilections or preconceptions. Indeed, the election of legislators is often based on their announced views and attitudes on

public questions. But these distinctions do not obviate the basic requisite of fairness if the law prescribing the hearings invites the public not only to attend but gives it a right to be heard.

The test of fairness, we think, in public hearings conducted by law on matters of public interest, vague though it may be, is whether a fair-minded person in attendance at all of the meetings on a given issue, could, at the conclusion thereof, in good conscience say that everyone had been heard who, in all fairness, should have been heard and that the legislative body required by law to hold the hearings gave reasonable faith and credit to all matters presented, according to the weight and force they were in reason entitled to receive. Neither the hearings before the planning commission nor the hearing before the board of county commissioners, in our judgment, met this test.

█ The hearings under attack here, held before the planning commission and subsequently before the Skagit County Commissioners, were legislative in nature. *Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955); *State ex rel. Gunning v. Odell,* 58 Wn.2d 275, 362 P.2d 254 (1961); *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 422 P.2d 790 (1967). Required as a necessary precursor to the enactment of zoning ordinances or amendments thereto, the statute calling for the hearing not only allowed the public to be present but members thereof to be heard—to present argument and evidence and to influence openly the planning commission and county commissioners in reaching a decision.

The right to be heard implies a reasonable hope of being heeded. The right to be heard in a public hearing contemplates that, although the legislative body may, in finally deciding the matter, draw upon all kinds and sources of information including the opinions of experts, the hearing must be conducted as to be free from bias and prejudice; it must not only be open-minded and fair, but must have the appearance of being so. The word *hearing* in a statute shows a manifest purpose to afford due process of law. *Shields v. Utah Idaho Cent. R.R.,* 305 U.S. 177, 83 L. Ed. 111, 59 S. Ct. 160 (1938).

Unless prescribed by law, a public hearing of a legislative nature need not conform to technical rules of procedure or evidence (8A E. McQuillin, *Municipal Corporations* § 25.251 (3d ed., 1965 rev. vol.)), but common sense dictates that the hearing must be so conducted as to demonstrate that the relevant opinions of all persons invited to attend will be considered and weighed by the legislative body in the light of all other factors influencing their decision. Otherwise, the call for a public hearing would be an exercise in futility—an empty ceremony conducted simply to provide evidence of mechanical compliance with the statute requiring the public hearing while concealing the purpose of evading it.

In assessing whether the hearings out of which the county commissioners decided to rezone Guemes Island were in law fair public hearings, we cannot escape the dramatic contrasts between the initial zoning procedures and the current rezoning procedures. We are obliged, we think, to ascertain what factors induced the county commissioners to first zone the island exclusively for residential-recreational uses and compare these factors with those which prompted them to reverse their zoning philosophy and let a large aluminum reduction plant operate there. The court should not ignore the time, money and effort spent in accomplishing the initial zoning in contrast to the procedures undertaken to promote a change. The years of study, debate and public discussion and the expenditures of public money leading to the zoning of Guemes Island residential and recreational called for the most prudent and careful examination of public views before enacting any drastic departures from so deliberately and carefully adopted schemes. Hence, a late short-term proposal that a large waterfront tract of residential property be zoned for heavy industry, when there was at the time an abundance of industrial sites elsewhere available, demanded that any hearings required by law as a precondition to enacting such changes be openly, avowedly and fundamentally fair.

When the planning commission announced at the close of a public meeting that it would go into executive

session, it was within its rights. But when, pursuant to this announcement of a closed session, it invited representatives of the aluminum company and other powerful advocates of the zoning changes to attend and be heard, but deliberately excluded opponents of the proposed rezoning, the hearing lost one of its most basic requisites—the appearance of elemental fairness. Deprived of this essential appearance of fairness, the hearing failed to meet the statutory tests. Courts have, in other contexts, consistently held invalid zoning enactments or amendments thereto which have been enacted without sufficient public notice or which have substantially departed from the statutory norms prescribed for such notice. Annot., 96 A.L.R.2d 449 (1964). By the same principle, a zoning enactment adopted in proceedings which do not meet the tests of manifest fairness should similarly be held invalid. In this case, the hearings called for by the statute as an essential precondition to the enacting of zoning changes were so wanting in apparent fairness as to vitiate the legislation emerging from them.

■ Along with the failure to conduct the public hearings fairly, both in substance and appearance, we are convinced that the rezoning constitutes a flagrant case of illegal *spot zoning*. Spot zoning has come to mean arbitrary and unreasonable zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan. Spot zoning is a zoning for private gain designed to favor or benefit a particular individual or group and not the welfare of the community as a whole. *See* C. Rhyne, *Municipal Law* § 32-3, at 825 (1957). The vice of a spot zone is its inevitable effect of granting a discriminatory benefit to one or a group of owners and to the detriment of their neighbors or the community without adequate public advantage or justification. *Thomas v. Town of Bedford,* 11 N.Y.2d 428, 184 N.E.2d 285 (1962). Zoning merely for the benefit of one or a few, or for the disadvantage of some and with no sub-

stantial relationship to the public health, safety, general welfare or morals, in conflict with either the comprehensive zoning plan or ordinance is arbitrary and capricious and unlawful. *Eckes v. Board of Zoning Appeals of Baltimore Cy.*, 209 Md. 432, 121 A.2d 249 (1956.).

Thus, it has been held that the rezoning of a residential tract of land to light industrial zoning because factory owners threatened to leave the city unless such tracts were made available for light industry was held to be an illegal spot zoning. That the factories provided employment did not constitute a substantial contribution to the general welfare as contemplated by the zoning laws as the public detriments flowing from locating factories in that particular district far exceeded the benefits attributable exclusively to locating factories in that same district. *Fritts v. Ashland*, 348 S.W.2d 712 (Ky. App. 1961).

Therefore, it is universally held that a spot zoning ordinance which singles out a parcel of land within the limits of a use district, and marks it off into a separate district for the benefit of the owner, and permits the use of that parcel inconsistent with the use allowed in the rest of the district, is invalid if it is not in accordance with the comprehensive plan and is merely for private gain. *Cassel v. Mayor & City Council of Baltimore*, 195 Md. 348, 73 A.2d 486 (1950).

■ We would accept as good sense the proposition declared in *Mathis v. Hannan*, 306 S.W.2d 278 (Ky. App. 1957), at 280, that the matter of size in zoning a spot is relative and should be considered in relation to all other circumstances and conditions:

> The author points out that spot zoning amendments sabotage the laudable efforts of progressive municipal authorities to zone comprehensively the entire municipality. Yokley, by the use of the words,. "small lot or parcel of ground," seems to limit the application of the spot zoning doctrine to small areas and we think it is a familiar association because most of us associate the word, "spot" with a small area in comparison with a large one, *but the largeness and smallness are relative, and proper use may be determined only by comparison.*

The spot that Lady Macbeth attempted to exorcise ("Out, damned spot! Out, I say!") was probably imaginary and did not exist at all except in her imagination, while sunspots, our dictionary says, may vary "from mere apparent points (probably 1,000 miles across) to spaces of 100,000 miles in extent." *So we believe that each case must be determined in accordance with its circumstances.* We cannot arbitrarily say that a 50 foot lot is small and a 13 or 14 acre tract is not small. *Each must be related to its surroundings.*

(Italics ours.)

This court has said that spot zoning is and should be universally condemned (*State ex rel. Miller v. Cain,* 40 Wn.2d 216, 242 P.2d 505 (1952)); that spot zoning is arbitrary, capricious and unreasonable (*Pierce v. King County,* 62 Wn.2d 324, 382 P.2d 628 (1963)); and that a zoning ordinance must rest upon the public health, safety, morals or general welfare. *Anderson v. Seattle,* 64 Wn.2d 198, 390 P.2d 994 (1964).

The foregoing principles, it appears, forbid this amendment to the zoning resolution and reveal it as an illegal spot zoning. Since size of the rezoned area must be considered in relation to the size of the whole district affected (*Mathis v. Hannan, supra*), we must relate the approximately 470 acres zoned for heavy industry to the entire island of about 5,500 acres zoned residential-recreational. When, with no change whatever in circumstances and conditions, and after about 5 years of intensive study and numerous hearings, Guemes had been zoned residential-recreational, the aluminum company's undertaking to buy the property for the site of its reduction plant constituted no change of conditions adequate in law to support the rezoning. With an abundance of sites still available in areas zoned industrial, the fact that the aluminum company preferred Guemes Island to all others and insisted upon having it shows that the rezoning under attack here was for the peculiar benefit of the aluminum company, and detrimental to the neighboring owners and the general welfare. To meet the company's demands, we think, was unreasonable, arbitrary and capricious, and, therefore, illegal.

Therefore, the amendments to the interim zoning code, maps and comprehensive plan, purporting to create an industrial zone on Guemes Island, are void, and the cause is remanded to the superior court for entry of a decree so declaring.

FINLEY and ROSELLINI, JJ., concur.

HAMILTON and McGOVERN, JJ., concur in the result.

HILL, J. (dissenting)—I dissent. Bereft of the idyllic background created for it by the majority (and not substantiated in the record), Guemes[2] is just across the channel from Fidalgo[3]—both islands a part of Skagit County and subject to zoning and rezoning like any other part of that county.

I, too, have examined the extensive record prepared by the planning commission and presented to the county commissioners. It comes to this court by way of the Skagit County Superior Court from whose judgment this appeal is taken. From this examination, I would present the following as the facts pertinent to the present controversy.

The Skagit County Planning Commission recommended the rezoning of roughly 490 acres. The Skagit Board of County Commissioners, in whom the final authority rested, amended the Interim Zoning Ordinance in accordance with the recommendation.

The rezoning was challenged in the Skagit County Superior Court by property owners on Guemes Island (a peti-

---

[2]The majority's placing Guemes in the San Juan archipelago may cause surprise in some quarters as Rosario Strait has been decided to be the eastern boundary of the San Juan archipelago. *See* Decision on Geographic Names in the United States by the United States Board on Geographic Names, Decision List 6401. The accuracy of the designation is, of course, not material to the determination of the legal issue confronting the court. "Save the San Juans" was merely the rallying cry of one of the embattled groups of citizens in the emotion-packed controversy which wracked Skagit County preceding the rezoning, which is the reason for this litigation.

[3]The city of Anacortes is on this island as is a considerable area zoned for industrial use.

tion for a writ of certiorari, or an alternative writ of prohibition).

The senior Superior Court Judge of Washington State, the Honorable William J. Wilkins, presided at the trial, and in an 11-page memorandum opinion answered each of the objections made by the opponents of the rezoning and upheld the action of the planning commission and the Skagit Board of County Commissioners in authorizing the rezoning.

The judgment of the superior court was appealed to this court, and, after a hearing and a rehearing, I would affirm the action of the superior court in refusing to interfere with the action of the county commissioners in authorizing the rezoning.

My reasons are well expressed in the following portions of the comprehensive memorandum opinion of Judge Wilkins.

"At the outset, I should make it clear that it is not my province to substitute my views for that of the Planning Commission and County Commissioners of Skagit County. My job is merely to review the action taken by them and determine whether their action in rezoning these 400 plus acres on Guemes Island last November was arbitrary and capricious and, therefore, invalid. As was so ably and tersely stated by Mr. Justice Ott in the *Myhre* case, 70 Wn.2d Dec. 203, at Page 206 [70 Wn.2d 207, 210 (1967)], 'Zoning is a discretionary exercise of police power by a legislative authority. Courts will not review, except for manifest abuse, the exercise of legislative discretion . . . manifest abuse of discretion involves arbitrary and capricious conduct. Such conduct is defined to be without consideration and in disregard of the facts . . . *one who asserts that a public authority has abused its discretion and is guilty of arbitrary, capricious and unreasoning conduct has the burden of proof* . . . If the validity of the legislative authority's classification for zoning purposes is fairly debatable, it will be sustained.'

"On April 4, 1966, after at least 3 years' study, the Skagit County Planning Commission recommended to the Board

of County Commissioners for adoption a comprehensive plan for Skagit County which said plan was adopted by the Board the following day, the Board stating, 'The Board deems it necessary for the purpose of promoting the public health, safety, and general welfare, to adopt the comprehensive plan.'

"On April 12, 1966, the Board of County Commissioners adopted an Interim Zoning Ordinance, including the zoning map.

"Prior to the adoption of the comprehensive plan, the Planning Commission held public hearings, due and timely notices of the times and purposes of such meetings, having been given in accordance with the statutes.

"All of Guemes Island which comprises an area of about 8 miles[4] and is separated from the City of Anacortes by roughly a mile of water was zoned for residential use under the comprehensive zoning plan. Why the entire island was zoned residential is not disclosed by the record, but one may conclude that it was the intention of the Commission to continue the study of such zoning with the view of re-zoning a portion of the island later on. Under the title of *Plan Development and Revision*, the Commission stated, 'This plan shall be periodically reviewed by the Planning Commission and said Board. In addition to adding more detailed plans, it may be necessary from time to time to change basic features of the Plan, as economic, social or technological changes indicate a better basic pattern of land use or a need for re-evaluation of planning principles and objectives.'

"In the early part of September, 1966, an application was filed with the Board of County Commissioners and the Planning Commission for the rezoning of roughly 700 acres on Guemes Island for industrial uses by Intervenor Northwest Aluminum Company and others. Thereafter, on October 10, 1966, the Planning Commission initiated proceedings for the rezoning of a larger portion of Guemes Island for commercial uses and for adoption of certain amendments to the Interim Zoning Ordinance.

---

[4] 8 square miles.

"Due and timely notices were given by the Planning Commission of public hearings to be held for consideration of the proposed changed zoning for said portion of Guemes Island, which public meetings were held on October 24, 1966, and on November 18, 1966.[5] . .

"Thereafter, at a public hearing on November 29, 1966, the Board of County Commissioners adopted the rezoning recommended by the Planning Commission, amended the comprehensive zoning plan, and interim zoning map and Ordinance and approved the findings and reasons therefor.[6]

"These actions have been commenced by certain residents of Guemes Island against Skagit County challenging the validity of the said proceedings for the rezoning of this portion of Guemes Island consisting of roughly 490 acres and for amending the Interim Zoning Ordinance and zoning map.

"The plaintiffs in these cases consolidated for the purpose of trial urge in support of their claim that the proceedings for the rezone was invalid for the following reasons:

"(1) The industrial rezoning was invalid because it violates the stated purposes and objects of the Skagit County Comprehensive Plan.

"(2) The Board of County Commissioners lacked jurisdiction to adopt the industrial amendment to the com-

---

[5]This should be November 7, 1966. The public hearings were extensive; from 10 a.m. to 3:45 p.m. on October 24; and from 10 a.m. to 6:40 p.m. on November 7.

The planning commission met in executive session on November 14, 1966, and conferred with representatives of the Bonneville Power Administration and the Northwest Aluminum Company on special problems particularly involving air pollution. The planning commission held a public meeting on November 18 and took action recommending the rezoning of a tract on Guemes Island for industrial use. At the same time the planning commission adopted findings and set forth reasons in support of its recommendation.

[6]This paragraph of Judge Wilkins' opinion requires some amplification. The county commissioners did have a public hearing at their morning session on November 29, 1966.

In the afternoon session, they took action immediately upon reconvening—adopting the rezoning as recommended by the planning commission. The chairman of the county commissioners pointed out that the afternoon session was a "public meeting" but not a "public hearing."

prehensive plan map because there was no evidence of a 'change of conditions' or 'need,' as those terms are judicially defined in land-use cases.

"(3) The industrial rezone is invalid because it is a 'spot-zone.'

"(4) Because Ordinance 4081 is a valid interim zoning ordinance, the county lacked capacity to amend it on an ad hoc basis.

"(5) The industrial rezoning is invalid because during its adoptive process, the plaintiffs were denied due process of law; private hearings were held, of which they had no statutory notice and from which they were excluded. The Board of County Commissioners denied adequate time for presentation and abitrarily discriminated at its public hearing.

"(6) The industrial rezoning is invalid because it was not recommended by a majority of the membership of the Planning Commission as required by RCW 36.70.400 and 36.70.600.

"(7) The Planning Commission lacked jurisdiction to entertain the petition for rezoning or initiate the proposal. Exclusive jurisdiction lies in the Board of Adjustment.

"It should be noted that during these proceedings we have been concerned only with reviewing the records accumulated by the Planning Commission. These are voluminous, but during the time permitted, I have endeavored to read all of these records so as to be certain that I have reviewed everything, both pro and con, presented to the Planning Commission and the Board of County Commissioners.

"Realizing as I do the importance of this decision to the people of Skagit County and bearing in mind that I have no right to substitute my views for that of a legislative body, I have decided that in fairness to these dedicated and devoted men serving on this Planning Commission and the duly elected representatives of Skagit County, the Board of County Commissioners, I must on the basis of the entire record hold that the plaintiffs have not met their burden

and proved to my satisfaction that this rezoning of a portion of Guemes Island was invalid. Although, as Mr. Justice Hale commented in the case of *Pierce v. King County,* 62 Wn.2d 324, 'Scarcely a generation has passed since the adoption of the first zoning statute in this state in the year 1936,' the fact is that county planning has made its greatest strides since the close of World War II, and especially, county-wise, in this state during the past decade. Today throughout the various counties in this state we have civic minded citizens devoting their time and energies to future planning for their communities. This augurs well for our state and the future welfare of our citizens.

"Answers to the first four issues raised by Plaintiffs which I have just enumerated will be found in the findings and reasons thereof of the Planning Commission which were adopted by the Board of County Commissioners and for convenience and reference are attached hereto.

"From the entire record before the Planning Commission, the said Commission was justified in concluding:

"(1) That the industrial rezoning was valid because it further promoted the stated purposes and objects of the comprehensive plan and that what was done was in support of that plan; that the said rezoning was in conformity with one of the objectives; i.e., the highest and best use in the public interest of the land in Skagit County. The Commission were entitled to accept the statement of Mr. McKee, the Port Commissioner, 'We do think that the classification of the Guemes property in question here today as industrial would, for all the reasons I have touched on this morning, result in the highest and best use for this land, without harm to neighboring areas.' . . .

"(2) That a 'change of conditions' and 'need' did exist warranting the reclassification. Reference is made to the minutes of the regular meeting of the Planning Commission dated October 10, 1966, on Pages 6 and 7 thereof, 'As the next order of business, a statement was made by Wayne Kite to the effect that at the time of the adoption of the comprehensive plan, the Guemes Island area was

used principally for residential purposes in addition to some ranching and grazing. There was at this time no indication that industry would be concerned with locating there. Since that time, we have seen increased industrial activity throughout the entire Puget Sound area as well as in our own county. We have learned that a major industry has given study to this vicinity as a possible site for their processing plant and have indicated that Guemes Island is well suited for their particular industry. Because of the deep water harbor, they state that it is the only satisfactory site in the area. Mr. Kite stated that it is among the objectives of the comprehensive plan to recognize the need for industrial development, to recognize the needs of the county in terms of economic growth, tax base, employment demands on a year-around basis and also the necessity to protect the public interest in terms of public health and general welfare from possible detrimental effects from air and water pollutants. In view of these changed and changing conditions since the adoption of the comprehensive plan and interim zoning ordinance, we have made studies and further studies will be made. Also in view of these changing conditions, it seems to be in order that we should recognize the changing conditions and the studies that have been made and hold a public hearing to consider amending the comprehensive plan and land use map.'

"See also the comments of Mr. Justice Rosellini in his dissent on Page 15, *Myhre v. Spokane,* supra [70 Wn.2d at 219].

"The Planning Commission were entitled to conclude as they did at their meeting of October 24th that they looked upon their original zoning of Guemes Island as of a temporary nature and that there was now a need not previously considered to provide for water-bourne industry not needing rail or highway facilities.

"(3) That this was not spot zoning, and therefore arbitrary and capricious, but was a plan in support of the highest and best use and was directly related to the public health, safety and morals and the general welfare

of the people of Skagit County. Support for this proposition will be found in *Anderson vs. Seattle,* 64 Wn.2d 198, and *McNaughton vs. Boeing,* 68 Wn. Dec. 655 [68 Wn.2d 659 (1966)].

"(4) That under the Interim Zoning Ordinance, the county did not amend it on an *ad hoc* basis, but rather on the basis that there was a large acreage, the rezoning of which would lead to further planning of buffer zones and other changes in zoning, all of which would lead to further industrial development and toward establishing a more healthy basis from the standpoint of the economy and human resources. Obviously it was not the intention of the Commission in the first instance to 'freeze' the zoning of Guemes Island as residential. Such zoning was of an interim or temporary basis, the Commission having in mind an early change to more realistic zoning of the entire island. Early amendment was contemplated and especially was called for upon receipt of the information regarding industrial needs.

"(5) I must decide on the basis of this record that Plaintiffs were not denied due process. The times and purposes of public meetings were timely made known at which meetings full opportunity was given for discussion of the proposed rezoning by citizens favoring and opposing the rezoning. Citizens representing both sides were afforded full opportunity to meet separately with the Planning Commission and to submit written material outside of the public hearings in support of their positions.

"I am satisfied that the requirements of our statutes regarding public hearings were fully complied with. In addition, the Commission were entitled to hold executive sessions, meet separately with proponents and opponents in the progress of their studies for legislative action. The question, I think, is were the public timely notified of the meetings and the purpose of such meetings and afforded an opportunity to present their views. The record demonstrates that the Commission was fully aware of the views of the citizens of Skagit County on the question

of rezoning Guemes Island and exhibited patience and understanding throughout those public meetings.

" (6) The 6th point raised by Plaintiffs is that the industrial zoning is invalid because it was not recommended by a majority of the Commission.

"The record discloses that Clyde Shrauger was first appointed to a one-year term on the Planning Commission effective September 1, 1961. Upon the expiration of his one-year term he was re-appointed on September 1, 1962, to a four-year term which of course would terminate September 1, 1966. Through inadvertence, this termination of his term was overlooked, and he was not re-appointed until the issue was raised by Plaintiffs during this past week. Meantime, he has participated in all activities of the Commission regarding the rezoning of a portion of Guemes Island for industrial uses, and with four other members of the Commission voted for said rezoning, two members of the Commission voting against said rezoning. The issue is now raised for the first time that Mr. Shrauger's vote was void, thus leaving only 4 votes of the Commission in favor of the rezoning, 4 votes not being a majority of the Commission of 9. As stated above, Mr. Shrauger has been a member of the Planning Commission since its inception in 1960, and is knowledgeable on all matters and studies relating to the adoption of the comprehensive plan as well as the studies relating to the rezoning. Mr. Shrauger was not aware that his term had expired and, in good faith, participated as a member of the Board at its meetings and in its discussions. The law does not favor the disqualification of a member on such technicalities and declares him to be a *de facto* officer of the Planning Commission. 15 Wn.2d 345; 71 A.L.R. 848.

" (7) The claim is made that the Planning Commission lacked jurisdiction to initiate the rezoning of Guemes Island; that such authority so to do rests with the Board of Adjustment. With this proposition, I cannot agree. The Planning Commission had full authority to pursue

its studies and to initiate such proceedings. Reference should be made to R.C.W. 36.70.550; 560; 570; 580; 590; and 600.

"We may now assume that the Planning Commission is now prepared to move ahead with its studies on proper further rezoning of Guemes Island creating buffer zones where needed for this industrial area to the end that the residents there may continue to enjoy the type of suburban living they have there and which type of living we all enjoy. It goes without saying that the Planning Commission are fully alerted to the responsibility which is theirs to lay down stringent guidelines for the control of any industrial activity that may be placed there. . . ."

I have little to add to Judge Wilkins' very adequate discussion of the facts and the law. The issues discussed under (3), *i.e.*, spot zoning, and (5), *i.e.*, the failure to accord due process to the opponents of the rezoning—represent the principal points of disagreement within this court and are the only issues on which I deem it necessary to expand Judge Wilkins' opinion. We will consider the latter first. The executive session of the planning commission, referred to in footnote 2, seems to be regarded as particularly reprehensible. As Judge Wilkins has pointed out, neither the planning commission nor the board of county commissioners is limited to a consideration of the testimony presented in public hearings when determining what action will be taken.

I recognize fully the desirability and value of public hearings with reference to zoning and rezoning. The purpose of such hearings is to provide forums that are easily accessible to the community at large to make known their views and air their grievances on matters before a planning commission. Such hearings can be very helpful to a planning commission in discharging its responsibility when determining whether the granting of an exception or variance is consistent with the community interests and general welfare. (*See* 2 E. Yokley, Zoning Law and Practice (3d ed.), § 13-9 (1965)).

Such importance is attached to the information and arguments presented at public hearings, that a member of a zoning board not present at such a public hearing will not be permitted to have his vote taken and counted at a subsequent executive session called to consider action after such public hearing. *Koslow v. Board of Zoning Appeals,* 19 Conn. Supp. 303, 112 A.2d 513 (1955); *Sesnovich v. Board of Appeal of Boston,* 313 Mass. 393, 47 N.E.2d 943 (1943).

The law required that public hearings be held, and they were. There is no contention that any member of the public had anything to say that had not been said in the two lengthy public hearings. The objection is that executive sessions were also held, and the contention seems to be that no information can be considered that does not come through a public hearing.

However, no such limitation is placed on planning commissions or boards of county commissioners by our statute. They are not judicial bodies, confined to the record, but administrative and legislative bodies with certain quasi-judicial functions; and the fact that a public hearing is required does not mean that a planning commission may not act on facts which are known to it, even though not produced at the public hearing. *Gerstenfeld v. Jett,* 374 F.2d 333 (D.C. Cir. 1967); *Parsons v. Board of Zoning Appeals of New Haven,* 140 Conn. 290, 99 A.2d 149 (1953); *Tuite v. Zoning Bd. of Review of Woonsocket,* 96 R.I. 307, 191 A.2d 155 (1963). The Supreme Court of Arizona has an interesting comment in *Hart v. Bayless Inv. & Trading Co.,* 86 Ariz. 379, 389, 346 P.2d 1101, 1108 (1960), where it says:

4. *Intervening unnoticed hearings.* Plaintiff contends, in regard to the 1951 ordinance, that both the Commission and the Board violated the Zoning Act by holding unnoticed hearings subsequent to the hearings for which notice was published and prior to the adoption of the zoning ordinance. We find no support in the statute for this contention. The requirement is for a public hearing, to be held after due notice, but the Act does not state that either the Commission or the Board must act immediately upon the matters presented at the hearing; nor does it specifically preclude a further independent in-

vestigation by either body into those sources of informa-
tion which may be helpful.

We turn our attention now to the "spot·zoning" issue.
The majority's attack on this rezoning of 490 acres as spot
zoning seems to be stretching that concept to the limits of
elasticity.

There are very few communities in the United States
where an industry that requires three-quarters of a section
of land and extensive deep water frontage for its operations
is going to be able to locate without extensive rezoning be-
ing necessary. The majority labels such rezoning as "spot
zoning." We have heretofore said, "[z]oning cannot be a
straight jacket to halt the burgeoning business and indus-
trial life of a community." *McNaughton v. Boeing,* 68 Wn.2d
659, 661, 414 P.2d 778.

If we accept the majority's definition that "[s]pot zoning
is a zoning for private gain designed to favor or benefit a
particular individual or group and not the welfare of the
community as a whole"; and if we concede that the present
rezoning was designed to favor and benefit a particular
industry, it does not follow that it is not also for the welfare
of the community as a whole.

Opinions may differ as to whether this rezoning was for
the welfare of the community as a whole. The appointive
and elective official whose responsibility it was to make
that decision have acted.

It is well to remember, too, that only the Skagit Board
of County Commissioners had authority to amend the In-
terim Zoning Ordinance, and that it was not bound by
recommendations of the planning commission. It was not a
rubber stamp; it was a legislative body acting on the recom-
mendation of an administrative body, which also had been
acting in a quasi-judicial capacity. The board made its own
decision in accord with what it regarded as the best interests
of Skagit County when it amended the Interim Zoning
Ordinance to make some 490 acres of Guemes Island avail-
able for industrial use.

It is my view that the Superior Court for Skagit County
decided this matter properly when it refused to interfere

with the action taken by the Skagit Board of County Commissioners, elected to adopt and amend zoning ordinances.

HUNTER, C. J., WEAVER and NEILL, JJ., concur with HILL, J.