IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Parentage of J.D.W. and J.O.W. | ) ) ) | No. 80497-9-I |
| JAMIE LEE PONSARAN, | ) ) | DIVISION ONE |
| Appellant, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| LYNDSEY ANKER, | ) ) | |
| Respondent, and | ) ) ) | |
| JUSTIN WILLIAMS, | ) ) | |
| Defendant. | ) ) ) | |

SMITH, J. — In this case of first impression, we examine the standards for determining whether a petition for de facto parentage may proceed to a full adjudication under RCW 26.26A.440, Washington's de facto parentage statute. That statute, which was enacted in 2018 as part of an updated Washington Uniform Parentage Act (WUPA), chapter 26.26A RCW, requires the trial court to make an initial determination of whether the petition and any response raise "disputed facts material to the issue of standing."[1] We hold today that the proper focuses of that initial determination are whether the petitioner unequivocally parented the child as part of the child's family unit and whether that parent-child

---

[1] RCW 26.26A.440(3)(c).

Citations and pin cites are based on the Westlaw online version of the cited material.

relationship was consented to and fostered by a legal parent. We hold further that because the response to Jaime Ponsaran's petition for de facto parentage did not raise any disputed facts material to the issue of standing and because Ponsaran alleged sufficient facts, if proved, to satisfy each substantive element of de facto parentage, the trial court erred by dismissing his petition. Therefore, we reverse and remand for trial.

## FACTS

On March 26, 2019, Ponsaran filed a verified petition to be adjudicated a de facto parent of J.D.W. and J.O.W., whose legal parents are Lyndsey Anker, the children's mother, and Justin Williams, the children's biological father. In his petition, Ponsaran alleged that he had known J.D.W. since he was 18 months old and J.O.W. since her birth. Ponsaran alleged that he and Anker lived together with the children from December 2012 (when J.O.W. was about 3 months old and J.D.W. was about 21 months old) until May 2016, "and again for a number of months in 2017." He alleged that while living with the children, he "bonded with [them] and they view me as their dad." He alleged further:

> The children call me daddy. [Anker] refers to me as dad when speaking to the children or to third parties[. ] I am registered at school as their father and whenever we signed up for events I was listed as their father. Both [Anker] and I have posted photos of me with the children with references to me as "daddy."

He also alleged that even when he and Anker did not live together, he "spent between 2 and 5 nights per week with the children and spoke to them daily." Ponsaran alleged that he "took responsibility for the children's parenting, including but not limited to meals, baths, toilet training, [and] bed time routine"

when they were "little," and that as they grew older, he "took them to and from school and daycare, scheduled and took them to activities and was with them in the hospital when that was necessary." Ponsaran alleged that he held the children out as his own, that "[u]p until recently [Anker] fully supported my relationship with the children," and that Anker "routinely referred to me as the children's father and was aware the children always called me that." Ponsaran alleged that it was in the children's best interest for their relationship with him to continue, asserting, "I am their father. They have no one else who has taken on that role a[n]d I have been here for them for the past. They love me and are being harmed right now because they are unable to spend time with me."

After Ponsaran filed his petition, the trial court issued a case scheduling order setting a deadline for a "court review" at which "the judge will review the petition and any response filed to determine if the case should move forward." Williams later waived notice of the court review.

Anker responded to Ponsaran's petition on May 1, 2019, and asked the court to deny Ponsaran's petition. She alleged in her verified response that Ponsaran "liked to spoil the children with toys and playing" but that "[h]e never helped me with any of the children's responsibilities such as paying for childcare, insurance, groceries, rent or utilities." Anker alleged that Ponsaran "imposed himself on [Anker] and [her] family." According to Anker, Ponsaran "took [the children] to do fun things and was available during times [Anker] was at work and school because his schedule was flexible and he seemed to have an unlimited supply of money and time." With regard to the best interests of the children,

Anker alleged:

> [Ponsaran] enjoys the idea of being a fun dad, spoiling them [by] buying toys and taking them to do fun things, he enjoys the attention he gets from others by pretending to be a great "father". All of the other responsibilities a[s] far as raising the children to be functional adults is all up to me, he directly undermines me and the rules and restrictions I have set forth to protect the children. He has complete disregard for my wishes and to be frank despises me.
>
> While in his care in the past year the children have reported to me that they have witnessed him being intimate with at least three different women, they have seen him in the kitchen sticking needles in his stomach, they talk about the stacks of money he keeps in his closet. My daughter reported to me that she took a shower with one of the women, with their clothes on but this to me is extremely disrespectful seeing as she is a complete stranger to me. They have witnessed yelling and aggressive behavior towards me, my mother and people driving on the road. His lack of stability mentally, physically, emotionally and financially are major concerns of mine. He hasn't had a stable documented job since I've known him. He associates and takes the children around unsafe people and situations. His continued abuse of alcohol, narcotics and steroids make[s] him unsafe to be around. And his lack of care for any boundaries with the law and me as a mother, make him impossible to trust. At this point I feel he is using my children as pawns to try to inflict as much pain as possible to me and once again control my life.
>
> The people in our immediate circle have all commented to me on how the children's behavior has changed positively since [Ponsaran]'s recent absence, and I feel the same. Their demeanor is more calm. They are more considerate, more caring and more loving towards one another and to me. They are excelling at life and will continue to do so without the instability, disrespect, aggressive behavior and poor choices they witnessed by someone they once looked up to.

In her response, Anker also indicated that she had petitioned for a protection order. To that end, on May 20, 2019, a commissioner entered a one-year order protecting Anker, J.D.W., and J.O.W. from Ponsaran. The protection order was expressly made "subject to any parenting plan / further order" in the pending de

4

facto parentage proceeding.

On August 5, 2019, Ponsaran filed a request for court review regarding his petition. Together with his request, Ponsaran filed a notice for hearing setting his request for review for consideration without oral argument on August 20, 2019. Ponsaran also filed multiple witness declarations describing Ponsaran's interactions with the children.

On August 16, 2019, Anker filed a legal memorandum requesting dismissal of Ponsaran's petition. Anker also filed her own declaration and attached copies of her earlier petition for a protection order as well as certain documents filed in the protection order proceeding.

On August 21, 2019, the trial court entered an "Order After Review of Petition for De Facto Parentage" dismissing Ponsaran's petition. In its order, the court concluded that Ponsaran "has not alleged sufficient facts to meet the requirements for a finding of de facto parentage." (Emphasis omitted.) The court also entered the following "[o]ther [f]indings":

> RCW 26.26A.440 requires that [Ponsaran] demonstrate that the relationship between him and the children is in the best interest of the children. In her Response to the Petition for De Facto Parentage, dated May 1, 2019, [Anker] states that [Ponsaran] has a complete disregard for her wishes and despises her. She states that the children have witnessed [Ponsaran] being aggressive toward her and her mother. She states that [Ponsaran] lacks mental, physical, emotional and financial stability, and that she has never known him to have a stable job. She states that [Ponsaran] abuses alcohol, narcotics and steroids and that it is not safe for the children to be around him. She states that [Ponsaran] is using the children to try to control her. Finally, she states that the children's behavior has improved, and that they are kinder and more considerate since not having contact with [Ponsaran]. In his declaration dated July 12, 2019, [Ponsaran] does not address any of [Anker]'s allegations, and instead states that he has "no interest

in speaking publicly about [his] private life. . ." [Ponsaran] submitted evidence, including many declarations, regarding his close relationship with the children.  However, none of this evidence specifically addresses the mother's allegations. [Ponsaran] further indicates in his declaration that [Anker] obtained an Order of Protection against him.  The court takes judicial notice of the Order for Protection . . . . The Order for Protection protects both the mother and the children, and prohibits Mr. Ponsaran from having any contact with the children "subject to any parenting plan/further order in . . . [the de facto parentage action]."  The court finds that [Ponsaran] has not shown by a preponderance of the evidence that [it] is in the best interest of the children to continue a relationship with him based on [Anker]'s unrefuted allegations about his behavior."

(Some alterations in original.)  Ponsaran appeals.

ANALYSIS

Dismissal of Ponsaran's Petition

Ponsaran contends that the trial court erred by dismissing his petition for de facto parentage.  We agree.

*Standard of Review and Legal Standards*

We examine for the first time the process prescribed by RCW 26.26A.440, enacted in 2018 as part of an updated WUPA,[2] for adjudicating claims of de facto parentage.  What that process requires is an issue of statutory interpretation that we review de novo.  Hernandez v. Edmonds Memory Care, LLC, 10 Wn. App. 2d 869, 874, 450 P.3d 622 (2019).  Our "fundamental objective in determining what a statute means is to ascertain and carry out the legislature's intent."  Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 8, 419 P.3d 400 (2018).  "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain

---

[2] See LAWS OF 2018, ch. 6, § 509.

meaning as an expression of legislative intent." Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). To discern a statute's plain meaning, we consider the text of the provision in question and the context of the statutory scheme as a whole. Campbell & Gwinn, 146 Wn.2d at 10-11.

"Where a statute is susceptible of multiple reasonable interpretations after the plain meaning analysis, it is ambiguous, and we must turn to extrinsic evidence such as legislative history, common law precedent, or canons of construction to determine the legislature's intent." State v. Pittman, 185 Wn. App. 614, 620, 341 P.3d 1024 (2015). That said, where, as here, the statute at issue is based on a uniform act that (1) was promulgated by the Uniform Law Commission (ULC) and (2) mandates that consideration be given to the need to promote uniformity among the states that enact it,[3] we may look to the ULC's official comments to construe the statute even when it is not ambiguous. See Townsend v. Quadrant Corp., 153 Wn. App. 870, 878 n.7, 224 P.3d 818 (2009) (construing Washington's version of the uniform arbitration act, chapter 7.04A RCW), aff'd on other grounds, 173 Wn.2d 451, 268 P.3d 917 (2012); Lewis River Golf, Inc. v. O.M. Scott & Sons, 120 Wn.2d 712, 717, 845 P.2d 987 (1993) (construing Washington's version of the Uniform Commercial Code, Title 62A RCW).

---

[3] The WUPA is based on the 2017 version of the Uniform Parentage Act. See H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6037, at 3, 65th Leg., Reg. Sess. (Wash. 2018). And RCW 26.26A.900 provides, "In applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it."

*Standing To Proceed to Full Adjudication Under*
*Washington's De Facto Parentage Statute*

RCW 26.26A.440 is based on section 609 of the Uniform Parentage Act (UPA (2017)).  It provides a statutory path to legal parentage for de facto parents, who, loosely speaking, are adults who, with the consent and encouragement of a legal parent, have formed a strong parent-child relationship with a child.  See UNIF. PARENTAGE ACT (2017) § 609 cmt., 98 U.L.A. 80-81 (2019) ("Under this new section, an individual who has functioned as a child's parent for a significant period such that the individual formed a bonded and dependent parent-child relationship may be recognized as a legal parent.").  Under RCW 26.26A.440, an individual claiming to be a de facto parent of a child may "commence a proceeding to establish parentage of [the] child . . . [b]efore the child attains eighteen years of age[ ] and . . . [w]hile the child is alive."  RCW 26.26A.440(2).  The statute also provides that "[i]n a proceeding to adjudicate parentage of an individual who claims to be a de facto parent," the petitioner, i.e., the individual claiming status as a de facto parent, must establish each of the following seven elements:

> (a) The individual resided with the child as a regular member of the child's household for a significant period;
> (b) The individual engaged in consistent caretaking of the child;
> (c) The individual undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;
> (d) The individual held out the child as the individual's child;
> (e) The individual established a bonded and dependent relationship with the child which is parental in nature;
> (f) Another parent of the child fostered or supported the bonded and dependent relationship required under (e) of this subsection; and

      (g) Continuing the relationship between the individual and
the child is in the best interest of the child.

RCW 26.26A.440(4). If the petitioner demonstrates each of the above seven

substantive elements by a preponderance of the evidence, then "the court shall

adjudicate the [petitioner] to be a parent of the child." RCW 26.26A.440(4).

      The provision primarily at issue in this case is subsection (3) of the statute,

which dictates when a petition for de facto parentage can proceed to a full

adjudication. Specifically, RCW 26.26A.440(3) sets forth

> [t]he following rules govern[ing] standing of an individual who
> claims to be a de facto parent of a child to maintain a proceeding
> under this section:
>     (a) The individual must file an initial verified pleading alleging
> specific facts that support the claim to parentage of the child
> asserted under this section. . . .
>     (b) An adverse party, parent, or legal guardian may file a
> pleading in response to the pleading filed under (a) of this
> subsection. A responsive pleading must be verified . . . .
>     (c) Unless the court finds a hearing is necessary to
> determine disputed facts material to the issue of standing, the court
> shall determine, based on the pleadings under (a) and (b) of this
> subsection, whether the individual has alleged facts sufficient to
> satisfy by a preponderance of the evidence the [elements of de
> facto parentage]. If the court holds a hearing under this subsection,
> the hearing must be held on an expedited basis.

      What is clear from the plain language of this statute is that the trial court

must determine as a threshold matter, without the parties needing to raise the

issue, whether a petition may proceed to a full adjudication. Additionally, the

statute mandates a multi-step process for determining whether a petition can

proceed to a full adjudication: First, the petitioner must file a verified, or sworn,[4]

---

[4] See BLACK'S LAW DICTIONARY 1793 (10th ed. 2014) (defining "verify" as
"[t]o confirm or substantiate by oath or affidavit; to swear to the truth of").

pleading alleging "specific facts" supporting each of the seven statutory elements of de facto parentage. RCW 26.26A.440(3)(a). Next, an adverse party may file a verified response. RCW 26.26A.440(3)(b). The court then determines based on these verified pleadings whether there are "disputed facts material to the issue of standing." RCW 26.26A.440(3)(c). If so, the court must convene an expedited hearing "to determine" those facts. RCW 26.26A.440(3)(c). Finally, the statute is clear that to proceed to a full adjudication, the petitioner must, at a minimum, "allege[ ] facts sufficient to satisfy by a preponderance of the evidence the requirements of subsection (4)(a) through (g) of this section," i.e., the seven substantive elements of de facto parentage. RCW 26.26A.440(3)(c). In other words, to proceed to a full adjudication, the petition must "allege[ ] facts sufficient to satisfy by a preponderance of the evidence [the elements of de facto parentage]" even if the petition and response present no "disputed facts material to the issue of standing." RCW 26.26A.440(3)(c). It follows then that if there are "disputed facts material to the issue of standing," after determining those facts, the court must still consider whether the facts as determined by the court, combined with the undisputed facts in the petition, together could constitute facts sufficient to satisfy each element of de facto parentage. If so, the petition may proceed to a full adjudication.

It is apparent from the plain language of the statute that much turns on whether, as an initial matter, the petition and response present "disputed facts material to the issue of standing." RCW 26.26A.440(3)(c). Yet the statute does not expressly state the requirements for standing in the context of a de facto

10

parentage proceeding, and no single reasonable meaning emerges from the text or context of the statute.  See West v. Seattle Port Comm'n, 194 Wn. App. 821, 826, 380 P.3d 82 (2016) ("Questions of standing under Washington law begin with the statutes themselves.").  "Standing" arguably could be interpreted to refer merely to the requirements in RCW 26.26A.440(1), which state that "[a] proceeding to establish [de facto] parentage . . . may be commenced only by an individual who: (a) Is alive when the proceeding is commenced; and (b) Claims to be a de facto parent of the child."  But neither party argues that the standing threshold can be met merely by showing that the petitioner is alive and claims to be a de facto parent.  And, such a low bar to standing would be inconsistent with the purpose of the statute, which, according to the official comments, envisions a "*heightened* standing requirement."  UPA (2017) § 609 cmt. (emphasis added).  Furthermore, the statute provides no additional guidance in its text or scheme to inform our interpretation.  We therefore conclude that RCW 26.26A.440(3)(c) is ambiguous with regard to the requirements of standing and, thus, is also ambiguous with regard to when "disputed facts material to the issue of standing" exist.  Cf. Puget Soundkeeper All. v. Dep't of Ecology, 191 Wn.2d 631, 644, 424 P.3d 1173 (2018) ("Language is unambiguous if it has only one reasonable interpretation.").

To this end, Anker contends that "to confer standing, the court is to look to the seven factors listed in [RCW 26.26A.440(4)(a-g)] . . . and decide if the petitioner has demonstrated by a preponderance of the evidence that he has met all these factors."  In other words, Anker asserts that to proceed to a full

11

adjudication, the petitioner must prove all seven substantive elements of de facto parentage and, thus, a disputed fact is "'material to the issue of standing'" if it is material to any of those seven elements. Ponsaran, on the other hand, contends that "the petitioner should be, at this preliminary phase, afforded the benefit of the doubt" and that the court should treat the initial inquiry under RCW 26.26A.440(3)(c) as it would a CR 12(b)(6) motion. Thus, Ponsaran argues, in determining whether a petition may proceed to a full adjudication, the court must presume all facts alleged in the petition as true and dismiss "'only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" But neither party's proffered interpretation is persuasive.

Specifically, Ponsaran's assertion that the court must treat the allegations of the petition as true, even when they are disputed, renders meaningless the first part of RCW 26.26A.440(3)(c). That part expressly contemplates that when there is a dispute material to the issue of standing, the court will "determine [the] disputed facts" at an expedited hearing—not just accept the veracity of the petitioner's allegations. Furthermore, and as discussed, the purpose of the initial inquiry required under RCW 26.26A.440(3)(c) is to impose "a *heightened* standing requirement." UPA (2017) § 609 cmt. (emphasis added). But treating the initial inquiry as no more than a CR 12(b)(6) analysis hardly amounts to imposing a heightened requirement. For these reasons, we reject Ponsaran's contention that the analysis under RCW 26.26A.440(3)(c) is equivalent to a CR 12(b)(6) analysis.

But for the following reasons, we also reject Anker's contention that the petitioner must initially prove all seven elements of de facto parentage to the extent they are disputed and that any dispute as to any element is therefore "material to the issue of standing."

First, "[d]ifferent statutory language should not be read to mean the same thing: '[w]hen the legislature uses different words in the same statute, we presume the legislature intends those words to have different meanings.'" Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd., 182 Wn.2d 342, 353, 340 P.3d 849 (2015) (second alteration in original) (quoting In re Pers. Restraint of Dalluge, 162 Wn.2d 814, 820, 177 P.3d 675 (2008) (Sanders, J., dissenting)). Therefore, because the legislature used the phrase "the requirements of [RCW 26.26A.440](4)(a) through (g)" in one part of the statute but the phrase "the issue of standing" in another, then "facts material to the issue of standing" must mean something different than "facts material to the requirements of RCW 26.26A.440(4)(a) through (g)."

Second, we favor interpretations that give effect to every part of a statute over those that render parts of the statute redundant. See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 149 Wn.2d 660, 685, 72 P.3d 151 (2003) ("If at all possible, we are required to 'give effect to every word, clause and sentence in a statute,' leaving no part superfluous." (quoting Cox v. Helenius, 103 Wn.2d 383, 387, 693 P.2d 683 (1985))). To that end, the statute contemplates that if a petition proceeds to a full adjudication, then *at the adjudicative stage*, the petitioner will be required to prove all seven elements of

de facto parentage by a preponderance of the evidence. RCW 26.26A.440(4). Requiring the petitioner to prove the same seven elements to the same standard of proof just to *proceed* to the adjudicative stage would render the full adjudication redundant.[5]

In short, RCW 26.26A.440(3)(c), which requires the court to make a threshold determination as to whether the verified pleadings present "disputed facts material to the issue of standing," is ambiguous with regard to when a disputed fact is "material to the issue of standing." And neither party's proffered

---

[5] To be sure, Anker's contention appears consistent with the uniform statute, whose comments provide that "[a]t the standing stage, . . . the requirements may be proved by only a preponderance of the evidence." See UPA (2017) § 609 cmt. But although RCW 26.26A.440 substantially conforms to the uniform statute, it does differ from it in one significant respect: While Washington's version requires proof by only a preponderance of the evidence at the adjudicative stage, the uniform statute requires proof by "clear-and-convincing evidence." Compare UPA (2017) § 609(d) with RCW 26.26A.440(4). In other words, unlike the Washington statute, the uniform statute contemplates a two-tiered approach, applying one standard of proof at the standing stage and a *higher* standard of proof at the adjudicative stage.

Indeed, it was for this reason that in interpreting the Maine statute on which the uniform statute is based, the Maine Supreme Court decided to apply the preponderance-of-the-evidence standard at the standing stage. See Davis v. McGuire, 2018 ME 72, ¶ 26, 186 A.3d 837, 845. ("To require a petitioner to prove at a preliminary hearing the same elements and to the same standard of proof that govern the plenary hearing would render the latter duplicative."); see also UPA (2017) § 609 cmt. ("This section is modeled on provisions that were recently enacted in Delaware and Maine.").

We presume that by rejecting the clear-and-convincing standard at the adjudicative stage and requiring instead that the petitioner prove all seven elements by a preponderance of the evidence at that stage, our legislature also envisioned that the petitioner would not be required to prove the same seven elements to the same standard of proof at the standing stage. Cf. Lundberg ex rel. Orient Found. v. Coleman, 115 Wn. App. 172, 177-78, 60 P.3d 595 (2002) ("[W]hen the model act in an area of law contains a certain provision, but the Legislature fails to adopt such a provision, our courts conclude that the Legislature intended to reject the provision.").

interpretation of the statute is persuasive.[6]

That said, the comments to the uniform statute provide guidance with regard to the legislative intent behind the statute. See Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., 125 Wn. App. 227, 241 n.38, 103 P.3d 1256 (2005) (court may look to uniform act's official comments to determine legislative intent where Washington statute substantially conforms to uniform act). Specifically, the comments provide that the purpose of the de facto parentage statute is to "ensure[ ] that individuals who form strong parent-child bonds with children with the consent and encouragement of the child's legal parent are not excluded from a determination of parentage simply because they entered the child's life sometime after the child's birth." UPA (2017) § 609 cmt. At the same time, the statute imposes a heightened standing requirement "to ensure that permitting proceedings by de facto parents does not subject parents to unwarranted and unjustified litigation." UPA (2017) § 609 cmt. In keeping with these declarations of purpose, we conclude that under RCW 26.26A.440(3)(c), whether a fact is "material to the issue of standing" must be determined through the lens of whether continued litigation would be "unwarranted and unjustified" in light of the underlying purpose of the de facto parentage. Accordingly, we must consider what makes litigation "unwarranted and unjustified" in the context of de facto

---

[6] Anker at times relies on the mandatory forms and, in particular, the form summons, form "FL Parentage 340," to support her contention that "in order for a case to move forward to trial, a petitioner must meet all seven factors as an initial inquiry." The form summons does state that "[t]he case will end at Step 1 unless the court finds that Petitioner, more likely than not, meets the requirements for a de facto parent." But "[t]he law must drive the forms, not vice versa." In re Marriage of Allen, 78 Wn. App. 672, 679, 898 P.2d 1390 (1995).

parentage. Neither party points us to any legislative history to illuminate this issue. Ponsaran, however, contends that we may look to the common law origins of the de facto parentage doctrine for guidance, and we agree.

Specifically, where a statute is ambiguous, and "in the absence of an indication from the Legislature of an intention to overrule the common law, new legislation will be presumed consistent with prior judicial decisions." State v. Bushnell, 38 Wn. App. 809, 810-11, 690 P.2d 601 (1984). To this end, the official comments to the uniform statute acknowledge that the uniform statute "*reflects* trends in state family law." UPA (2017) § 609 cmt. (emphasis added) (citing, among other cases, In re Parentage of L.B., 155 Wn.2d 679, 122 P.3d 161 (2005)). The comments also state that the statute's substantive requirements are based on factors developed under the common law de facto parentage doctrine and, thus, "a court may look to those common law decisions for guidance." See UPA (2017) § 609 cmt. Therefore, we look to prior judicial decisions regarding de facto parentage for guidance as to what constitutes "unwarranted and unjustified litigation" in the context of a de facto parentage proceeding. Cf. RCW 4.04.010 ("The common law, so far as it is not inconsistent with the Constitution and laws . . . of the state of Washington . . . , shall be the rule of decision in all courts of this state."); see also L.B., 155 Wn.2d at 689 ("Washington courts have . . . construed [RCW 4.04.010] to permit the adaptation of the common law to address gaps in existing statutory enactments." (emphasis omitted)).

L.B., in which our Supreme Court first recognized an equitable cause of

16

action for de facto parentage, is instructive. In L.B., Page Britain and Sue Ellen Carvin moved in together in 1989 after dating for several months. 155 Wn.2d at 682. Five years later, the couple decided to have a child and artificially inseminated Britain with semen donated by a male friend. L.B., 155 Wn.2d at 683. A girl, L.B., was born in 1995. L.B., 155 Wn.2d at 684. "For the first six years of L.B.'s life, Carvin, Britain, and L.B. lived together as a family unit and held themselves out to the public as a family." L.B., 155 Wn.2d at 684. "Carvin and Britain shared parenting responsibilities, with Carvin actively involved in L.B.'s parenting." L.B., 155 Wn.2d at 684. When L.B. was about six years old, Britain and Carvin ended their relationship, and in 2002, when L.B. was seven, Britain unilaterally terminated all of Carvin's contact with L.B. L.B., 155 Wn.2d at 684-85. Carvin filed suit and sought, among other things, recognition as a de facto parent to L.B. L.B., 155 Wn.2d at 685.

At the time L.B. was decided, no statutory path to de facto parentage existed under Washington law. Thus, when the case ultimately reached our Supreme Court, a question before the court was whether Washington recognized a common law cause of action for de facto parentage. L.B., 155 Wn.2d at 688. The court ultimately held that it did. L.B., 155 Wn.2d at 707.

In doing so, the court was guided by the principle that children have an interest in maintaining their relationships with those who are unequivocally a part of their "family"—even "[i]n the face of . . . evolving notions of what comprises a family unit." L.B., 155 Wn.2d at 687. For example, the court first reviewed existing cases and observed that they "support the proposition that Washington

17

common law recognizes the significance of parent-child relationships that may otherwise lack statutory recognition." L.B., 155 Wn.2d at 693. The court also observed that existing cases "make clear that individuals may comprise a legally cognizable family through means other than biological or adoptive." L.B., 155 Wn.2d at 693. The court then looked to legislative pronouncements on custody and visitation and observed that in the custody context, "with the paramount considerations of the child properly at the center of such disputes," custody awards were sometimes made "to persons not biologically related to the child, but who nevertheless have unequivocally 'parented' them." L.B., 155 Wn.2d at 698-99. And in the visitation context, "[t]he legislature's apparent intent behind Washington's current visitation statutes reveals a strong presumption in favor of parental involvement, fostering and protecting a child's significant relationships." L.B., 155 Wn.2d at 700. In other words, legislative enactments, consistent with the common law, also recognized a child's interest in maintaining relationships with individuals who have unequivocally parented them, whether or not those individuals would traditionally have been recognized as part of the child's family unit. See L.B., 155 Wn.2d at 701.[7] Finally, the court was persuaded by a

---

[7] Although L.B. examined the 2002 version of the WUPA, these same principles remain true under the current version. See, e.g., RCW 26.26A.060 (providing that provisions applicable to a father-child relationship also apply to a mother-child relationship and vice versa); RCW 26.26A.105 ("A parent-child relationship extends equally to every child and parent, regardless of the marital status of the parent"); Memorandum from the Uniform Parentage Act Drafting Comm. to Uniform Law Comm'rs 3 (June 9, 2017), https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=4cba0e51-85bd-98cd-4aa6-b5c7b3fe3c55&forceDialog=0 [https://perma.cc/HG4F-SM42] (describing protection of "established parent-child relationships" as a "core purpose" of UPA (2017)).

number of decisions from states that had recognized de facto parentage and, in particular, In re Custody of H.S.H.-K., 193 Wis. 2d 649, 533 N.W.2d 419 (1995), and E.N.O. v. L.M.M., 429 Mass. 824, 711 N.E.2d 886 (1999). In each of those cases, as noted by the L.B. court, the parties held themselves out as a family unit and actively coparented the child. See L.B., 155 Wn.2d at 702 (observing that in H.S.H.-K., the parties "gave the child names honoring the families of both partners, held themselves out to the public as a family unit, and actively coparented the child until their relationship ended"), 704 (observing that "E.N.O.'s holding principally rested on its conclusion that 'recognition of de facto parents is in accord with notions of the modern family,' and it is the actual family unit that should ultimately be afforded respect" (citation omitted) (quoting E.N.O., 711 N.E.2d at 891)).

In short, implicit in L.B.'s recognition of the de facto parentage doctrine is that a child's interests are served when individuals who have unequivocally parented the child as part of the child's "family unit" have the opportunity to establish that extending parental privileges to them would be in the child's best interests. Indeed, and although L.B. did not directly address the issue of standing, the court had little trouble concluding that Carvin, who lived with Britain and L.B. as a "family unit" for the first six years of L.B.'s life, shared parenting responsibilities with Britain, was named as a parent on L.B.'s school records, and was referred to by L.B. as "mama," should be allowed on remand to prove that she was a de facto parent. L.B., 155 Wn.2d at 684, 712.

At the same time, the L.B. court expressed an important limitation that is

19

relevant to our analysis of when litigation is "unwarranted and unjustified" in the context of de facto parentage. Specifically, after recognizing a cause of action for de facto parentage and setting forth its substantive requirements, the court addressed Britain's argument that granting Carvin parentage rights would "violate[ ] Britain's constitutionally protected liberty interest to care for and control her child without unwarranted state intervention." L.B., 155 Wn.2d at 709. The court rejected this argument and also dismissed Britain's fear that "'teachers, nannies, parents of best friends, . . . adult siblings, aunts, [ ] grandparents,' and every 'third-party . . . caregiver' will now become de facto parents." L.B., 155 Wn.2d at 712 (alterations in original). In doing so, the court explained, "Critical to our constitutional analysis here, a threshold requirement for the status of the *de facto* parent is a showing that the legal parent 'consented to and fostered' the parent-child relationship." L.B., 155 Wn.2d at 712. That is, "[t]he State is not interfering on behalf of a third party in an insular family unit but is enforcing the rights and obligations of parenthood that attach to *de facto* parents; a status that can be achieved only through the *active encouragement of the biological or adoptive parent* by *affirmatively establishing a family unit* with the *de facto* parent and child or children that accompany the family." L.B., 155 Wn.2d at 712 (emphasis added).

In short, although L.B. did not directly address the issue of standing, it provides two important guideposts with regard to whether subjecting a legal parent to a full adjudication would result in "unwarranted and unjustified litigation." First, to ensure that de facto parentage litigation does not result in

unlawful interference with legal parents' constitutionally protected interest in the care and custody of their children, the petitioner must at least make a threshold showing that a legal parent consented to and fostered a parent-child relationship between the petitioner and the child.  Second, to balance legal parents' interests against children's interests in preserving their relationships with those who have unequivocally parented them,[8] a petition should be allowed to proceed to a full adjudication if, *but only if*, the petitioner makes a threshold showing that he or she was a member of the child's family unit and unequivocally parented the child. We conclude that these guideposts are the touchstones for whether a disputed fact is "material to the issue of standing" under RCW 26.26A.440(3)(c). Specifically, to establish standing to proceed to a full adjudication of de facto parentage under RCW 26.26A.440, the petitioner must establish that he or she unequivocally parented the child as part of the child's family unit and that a legal parent consented to and fostered a parent-child relationship between the petitioner and the child.  It follows then that a disputed fact is material to the issue

---

[8] As one commentator has observed, there is more at stake than just continuity when it comes to the child's interests:

> Treating individuals who are functioning and relied upon as parents as *legal* parents is a critical advancement from the child's perspective.  Recognizing such a person as a legal parent means that the child is entitled to all of the protections that a child is normally entitled to receive from and through a parent.  This includes, for example, the right to receive Social Security and workers' compensation benefits in the event the parent becomes disabled or dies.  And, of particular importance, it also means that the parent has the same obligation to support the child as any other legal parent.

Courtney G. Joslin, De Facto Parentage and the Modern Family, 40 FAM. ADVOC. 31, 33 (2018).

of standing if it is material to whether the petitioner unequivocally parented the child as part of the child's family unit or whether a legal parent consented to and fostered a parent-child relationship between the petitioner and the child.

Our conclusion is supported by another case from our Supreme Court, In re Custody of B.M.H., 179 Wn.2d 224, 315 P.3d 470 (2013). There, in reversing the dismissal of a stepfather's petition for de facto parentage, the court stated, "Here, where it is alleged that [the petitioner] entered a child's life at birth following the death of that child's second biological parent, *and undertook an unequivocal and permanent parental role with the consent of all existing parents . . .* , justice prompts us to apply the de facto parent test." B.M.H., 179 Wn.2d at 244-45 (emphasis added). In other words, in concluding that the petitioner should be allowed to proceed to a full adjudication, the B.M.H. court, like the L.B. court, focused on the fact that the petitioner, who as the child's stepfather had undisputedly been a part of the "family unit," had undertaken an unequivocal parental role with the consent of a legal parent. Indeed, as the court observed in B.M.H., allowing a de facto parentage petition to proceed to a full adjudication when these threshold requirements have been met "balances the rights of biological parents, children, and other parties." B.M.H., 179 Wn.2d at 244.

Our conclusion also is consistent with the underlying purpose of the de facto parentage statute, which, again, is to "ensure[ ] that individuals who form strong parent-child bonds with children with the consent and encouragement of the child's legal parent are not excluded from a determination of parentage

22

simply because they entered the child's life sometime after the child's birth."
UPA (2017) § 609 cmt.; cf. Courtney G. Joslin, Preface to the UPA (2017), 52
FAM. L. Q. 437, 455 (2018) (explaining that de facto parentage provision was
added to "address th[e] gap in protection" left when the drafters of the UPA
(2017) amended the provision affording a presumption of parentage to those who
resided in the same household as the child by limiting it to those who resided
with the child *from birth*).[9]  Specifically, denying a full adjudication to an individual
who can show that he or she was part of the family unit, unequivocally parented
the child, and developed a parent-child relationship with the consent of a legal
parent would be contrary to the underlying purpose of the statute and, indeed,
the UPA itself.  See Memorandum from the Uniform Parentage Act Drafting
Comm. to Uniform Law Comm'rs, *supra,* at 3 ("New Section 609 . . . expressly
recogniz[es] de facto parentage by statute.  This is consistent with the current
trend *and is consistent with a core purpose of the UPA, which is to protect
established parent-child relationships.*" (emphasis added)).

Finally, our conclusion is consistent with the reality that not all of the seven
substantive elements of de facto parentage are susceptible to adjudication on the
"expedited basis" that RCW 26.26A.440(3)(c) contemplates when there are
issues of fact in dispute.  Most notable in this regard is the final element, which
requires the petitioner to prove that "[c]ontinuing the relationship between the
[petitioner] and the child is in the best interest of the child."
RCW 26.26A.440(4)(g).  "The criteria for determining the best interests of the

---

[9] In the WUPA, this presumption is set forth in RCW 26.26A.115(1)(b).

child are varied and highly dependent on the facts and circumstances of the case at hand." McDaniels v. Carlson, 108 Wn.2d 299, 312, 738 P.2d 254 (1987). Therefore, determining what is in the best interests of the child often requires substantial discovery, the involvement of neutral experts such as parenting evaluators, additional evaluations such as substance abuse evaluations, domestic violence assessments, and psychological evaluations, a determination of whether a guardian ad litem should be appointed and, if so, time for the guardian ad litem to fulfill his or her duties and report back to the court. Cf. RCW 26.26A.485(2) ("The court shall appoint a guardian ad litem . . . to represent a child in a proceeding under RCW 26.26A.400 through 26.26A.515, if the court finds that the interests of the child are not adequately represented."); GALR 2 (setting forth the responsibilities of a guardian ad litem). Indeed, if the child's best interests were considered material to the issue of standing, a hearing to resolve disputed facts would be required in nearly every contested case, as it is unlikely a respondent who contests the petition would agree that establishing de facto parentage would be in the child's best interests.

But this is not to say that the child's best interests go unaccounted for in the initial inquiry into whether a case may proceed to a full adjudication. Rather, and as discussed, children have a recognized interest in maintaining their relationships with those who have unequivocally parented them. See L.B., 155 Wn.2d at 698-99 (observing that "with the paramount considerations of the child properly at the center of such disputes, . . . courts have not hesitated to exercise their common law equitable powers to award custody of minor children, at times

making such awards to persons not biologically related to the child, but who nevertheless have unequivocally 'parented' them"). Therefore, allowing an individual to proceed to a full adjudication upon making a threshold showing that he or she has parented the child as part of the child's family unit and with a legal parent's consent in fact serves the child's interests. At the same time, allowing *only* those individuals who have made that threshold showing to proceed to a full adjudication "balances the rights of biological parents, children, and other parties." B.M.H., 179 Wn.2d at 244. As a result of this balancing, disputes "material to the issue of standing" will typically consist of disputes about the remaining substantive elements of de facto parentage, such as whether and for how long the petitioner resided with the child (so as to rule out individuals who are not part of the child's family unit), whether the petitioner expected financial compensation (so as to rule out temporary caregivers like babysitters), whether the petitioner held the child out as his or her own (so as to rule out relationships that are not parental in nature), and the extent to which a legal parent fostered the parent-child relationship (so as to protect the legal parent's constitutionally protected interest in the care and custody of the child). Indeed, contrary to Anker's contention that "without any review of the seven criteria prior to trial, . . . movants could harass nonmovants with useless, time-consuming, expensive, and stressful hearings," our interpretation of RCW 26.26A.440(3)(c) still imposes significant limitations on the types of individuals who can successfully move their petitions forward to a full adjudication.

In summary, we conclude that the de facto parentage statute requires the

25

following with regard to determining whether a petition may proceed to a full adjudication: First, the petitioner must file a verified petition alleging specific facts supporting each of the seven elements of de facto parentage. Next, an adverse party may file a response, which must also be verified. The court must then determine, based on the verified petition and any verified response, whether there exist "disputed facts material to the issue of standing," i.e., disputed facts material to whether the petitioner unequivocally parented the child as part of the child's family unit and whether a legal parent consented to and fostered a parent-child relationship between the petitioner and the child. If the court determines that there are no disputed facts material to the issue of standing, then the court must allow the petition to proceed to a full adjudication unless the petition does not allege sufficient facts, if proved, to satisfy each of the seven substantive elements of de facto parentage by a preponderance of the evidence. If, on the other hand, the court determines that there *are* disputed facts material to the issue of standing, the court must hold an expedited hearing to determine whether the petitioner has established by a preponderance of the evidence that he or she unequivocally parented the child as part of the child's family unit and whether a legal parent consented to and fostered a parent-child relationship between the petitioner and the child. If not, the court must dismiss the petition. Otherwise, the court must allow the petition to proceed to a full adjudication unless the facts as determined at the hearing, together with the undisputed facts alleged in the petition, are insufficient, even if proven, to satisfy each of the seven substantive elements of de facto parentage by a preponderance of the evidence.

26

Our conclusion today properly balances the interests of children and would-be de facto parents in maintaining their relationships with those with whom they have developed a strong parent-child bond, against legal parents' "fundamental right to make decisions concerning the care, custody, and control of their children" without unwarranted interference. B.M.H., 179 Wn.2d at 234. Additionally, and unlike the interpretations advanced by the parties, it gives effect to each part of RCW 26.26A.440(3)(c), which plainly requires the petitioner to do something more than allege a prima facie case of de facto parentage but also requires something other than proof, at the outset, of each substantive element of de facto parentage.

*Dismissal of Ponsaran's Petition*

Now that we have considered the process prescribed by RCW 26.26A.440(3)(c), we apply it to the trial court's dismissal of Ponsaran's petition. Ponsaran contends that the trial court erred by resolving disputed facts without a hearing, and we agree.

As discussed, RCW 26.26A.440(3)(c) provides that if there are disputed facts material to the issue of standing, the court must hold a hearing to determine those facts. Although the statute is clear that the hearing must occur on an expedited basis, it does not specify how such a hearing should proceed.

To this end, we acknowledge that courts may "adopt any suitable mode of proceeding to carry out a statutory directive where none is specifically pointed out and jurisdiction is otherwise conferred upon the court." Abad v. Cozza, 128 Wn.2d 575, 588, 911 P.2d 376 (1996); RCW 2.28.150. That said, any such

27

procedure must comport with principles of due process, which require "that a party receive proper notice of proceedings and an opportunity to present his position before a competent tribunal." Parker v. United Airlines, Inc., 32 Wn. App. 722, 728, 649 P.2d 181 (1982). Accordingly, we hold that if a court determines that a hearing is necessary under RCW 26.26A.440(3)(c), the court must at a minimum provide notice to the parties. Furthermore, because the stated purpose of the hearing is to "determine disputed facts," RCW 26.26A.440(3)(c), the court must also give parties an opportunity to present relevant evidence and argument to the court with regard to the disputed facts at issue.[10]

Here, it is clear from the court's order, and specifically its entry of findings, that the court concluded there were disputed facts material to the issue of standing. Yet the court did not convene a hearing to resolve those facts. This was error.

Anker disagrees and contends that the trial court *did* hold a hearing but that the hearing simply took place without oral argument, consistent with the notice of hearing that Ponsaran filed with his request for review. Specifically, Anker asserts that "given that Mr. Ponsaran filed a notice of hearing and additional declarations/information, he effectively turned the review into a motion, inviting a response from Ms. Anker pursuant to CR 8." Anker asserts further that

---

[10] Although we need not decide today whether an evidentiary hearing with oral testimony is required in all cases, we note that a trial court may abuse its discretion by not holding an evidentiary hearing when the verified pleadings present an issue of fact whose resolution requires a determination of witness credibility. Woodruff v. Spence, 76 Wn. App. 207, 210, 883 P.2d 936 (1994).

because Ponsaran noted his "motion" for consideration without oral argument, the trial court was justified in dismissing Ponsaran's petition based "on the information provided by Mr. Ponsaran in his Petition, declarations, and supplementary evidence, on the Response to the Petition and declarations from Ms. Anker, and the reply documents from Mr. Ponsaran."

Anker's contentions fail for two reasons. First, CR 8 is addressed to pleadings, not motions, and Anker's suggestion that CR 8 provides a mechanism for converting the review prescribed by RCW 26.26A.440(3)(c) into a motion is unpersuasive. Second, the expedited hearing contemplated by RCW 26.26A.440(3)(c) is initiated by the *court*, not the parties. Accordingly, once the trial court concluded that there were disputed facts material to the issue of standing, it was required to provide notice of an expedited hearing and, consistent with due process, an opportunity to submit evidence and argument relevant to the issues to be decided at the hearing. Indeed, even the mandatory form that Ponsaran used to request a review under RCW 26.26A.440(3)(c) states, "Review will be ex parte unless *the court* orders an expedited hearing. *You will receive notice of any hearing.*" (Emphasis added.) Therefore, Ponsaran's notice of hearing was unnecessary and, in any event, not a substitute for notice from the court. Similarly, Ponsaran's (and Anker's) filing of additional evidence was not a substitute for an opportunity to present evidence relevant to the specific issues to be considered at such a hearing.[11] Therefore, we reject

---

[11] As discussed, under RCW 26.26A.440(3)(c), the trial court is to determine whether there is a dispute material to the issue of standing based

Anker's contention that the procedure followed by the court complied with the procedure required under RCW 26.26A.440(3)(c).[12]

Ordinarily, under these circumstances, we would remand to the trial court for an expedited hearing to determine the disputed facts material to the issue of standing. But here, we remand for a full adjudication because the court also erred as a matter of law in concluding that Ponsaran's petition should be dismissed.

Specifically, and as discussed, the first step of the court's analysis under RCW 26.26A.440(3)(c) is to determine whether, based on the verified petition and any verified response, there is a disputed fact material to the issue of standing. If not, the trial court must move the petition forward to a full adjudication unless it fails to allege sufficient facts to satisfy each substantive element of de facto parentage by a preponderance of the evidence. These determinations—whether there are disputed facts material to standing and whether the petition alleges sufficient facts with regard to each element—do not

solely on the verified pleadings. Accordingly, the trial court erred to the extent that it considered additional materials in making this determination.

[12] Anker also points out that Ponsaran did not set a review hearing until some three weeks after the deadline set forth in the case scheduling order. We need not decide whether the review hearing was timely to resolve this appeal. But we observe that the record does not, as Anker asserts, show that Ponsaran was untimely. Specifically, although the case scheduling order set a deadline of July 16, 2019, for a review hearing, it also states that the review hearing date must be at least 20 days from the date of service if the respondent was served in person in Washington, 60 days if the respondent was served outside of Washington or by publication, or 90 days if the respondent was served by mail. But the record does not reveal when or how Williams, the children's biological father, was served. Accordingly, even if the timeliness of the review hearing were relevant to the issues on appeal, Anker failed to establish on the record that the review hearing was untimely.

call for the trial court to weigh evidence. Accordingly, as an appellate court, we are in as good a position as the trial court to make these determinations based on the verified pleadings, and we therefore review them de novo. See Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wn.2d 243, 252, 884 P.2d 592 (1994) ("'[W]here . . . the trial court has not seen nor heard testimony requiring it to assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence, then on appeal a court of review stands in the same position as the trial court in looking at the facts of the case, and should review the record de novo.'" (quoting Smith v. Skagit County, 75 Wn.2d 715, 718, 453 P.2d 832 (1969))).

Here, the *undisputed* facts in Ponsaran's petition establish the following narrative regarding Ponsaran's relationship with J.D.W. and J.O.W.:

Ponsaran has known J.D.W. since he was 18 months old and J.O.W. since her birth. Ponsaran and Anker lived together with J.D.W. and J.O.W. from December 2012 (when J.O.W. was about 3 months old and J.D.W. was about 21 months old) until May 2016—a period of 3 1/2 years. They also lived together for a number of months in 2017. Even when Ponsaran was not living with Anker and the children, he spoke with them daily.

During the time that Ponsaran, Anker, and the children lived together, Ponsaran bonded with the children. The children call Ponsaran "daddy." Anker was aware that the children refer to Ponsaran as their father, and Anker herself referred to Ponsaran as the children's "dad" when speaking to the children or to third parties. Anker has spoken positively about Ponsaran as a dad in various

31

cards and postings, and both Ponsaran and Anker have posted photos of Ponsaran with the children with references to Ponsaran as "daddy."

When the children were young, Ponsaran assisted with meals, baths, toilet training, and the children's bed-time routine regardless whether Ponsaran and Anker were living together. As the children grew older, Ponsaran took them to and from school and daycare, scheduled and took them to activities, and accompanied them at the hospital when that was necessary. Ponsaran undertook these activities without expectation of being paid. Ponsaran has been registered at the children's school as their father and was listed as their father when they signed up for events. He taught J.D.W. to ride a bike and took him to his first Mariners and Seahawks games. Ponsaran and J.D.W. have attended many sporting events since then. Ponsaran also signed J.D.W. up for and attended games and practices for soccer, football, and jujitsu. Ponsaran and J.O.W. also do things together, such as pretend playing and going to the park and the mall. Ponsaran has spent time with the children consistently since birth. Until recently (as of the time the petition was filed), Anker encouraged Ponsaran to spend time with the children, and Ponsaran spent between two and five nights a week with them. Additionally, the children would spend an additional four weeks per year with Ponsaran while Anker was on vacation.

These undisputed facts, if proven, plainly establish that Ponsaran was part of the children's family unit, that Ponsaran unequivocally parented them, and that Anker consented to and fostered a parent-child relationship between Ponsaran and the children. Indeed, Anker acknowledged in her response that she and

32

Ponsaran were in a relationship, that the children referred to Ponsaran as "Dad," and that Ponsaran "enjoys the idea of being a fun dad, spoiling them [by] buying toys and taking them to do fun things." Furthermore, Anker did not allege facts in her verified response to place into dispute whether Ponsaran was part of the family unit and unequivocally parented them with Anker's consent and encouragement. To be sure, Anker did state that she "disagree[d] with what [Ponsaran] said about" each element of de facto parentage and asserted that "[t]he relationship between [Ponsaran] and the children was not parental." But these general denials cannot be enough to create a dispute material to the issue of standing—otherwise, anything but an agreed petition would require an initial hearing. Indeed, even Anker does not contend that a general denial is enough to create a dispute material to the issue of standing, acknowledging instead that "[t]he facts the court is considering are those alleged in the petition *vs. those alleged in a response.*" (Emphasis added.)

In short, Anker's response, which focused not on whether Ponsaran *had* a parent-child relationship with the children but on his motivations for developing that relationship and his alleged faults as a parent, does not raise any disputes material to the issue of standing. Furthermore, if proven at trial, the facts alleged in Ponsaran's petition are sufficient to establish the first six elements of de facto parentage, i.e., that Ponsaran "resided with the child[ren] as a regular member of [their] household for a significant period," that he "engaged in consistent caretaking of the child[ren]," that he "undertook full and permanent responsibilities of a parent . . . without expectation of financial compensation,"

33

that he "held out the child[ren]" as his own, that he "established a bonded and dependent" parental relationship with the children, and that "[a]nother parent . . . fostered or supported the bonded and dependent relationship." RCW 26.26A.440(4)(a)-(f). And Ponsaran also alleged, with regard to the final element—best interests of the children—that he is the only father the children have known and that "[t]hey have no one else who has taken on that role a[n]d I have been here for them [in] the past." In other words, not only are there no disputed facts material to the issue of standing, Ponsaran's petition also alleges sufficient facts that, if proven, establish each element of de facto parentage by a preponderance of the evidence. For these reasons, the trial court erred by not moving Ponsaran's petition forward to a full adjudication under RCW 26.26A.440(4).[13]

Anker disagrees, contending that the trial court properly dismissed Ponsaran's petition based on a failure of proof on the best interests element. This contention fails for two reasons.

First, Anker's contention relies on the proposition that the petitioner must prove all seven elements of de facto parentage to proceed to a full adjudication. But as we explained above in rejecting that proposition, the purpose of the initial hearing is to resolve only those disputes "material to the issue of standing," not to

---

[13] Although we apply a de novo standard of review, we would reach the same conclusion even under an abuse of discretion standard, i.e., that in light of the uncontested allegations establishing that Ponsaran unequivocally parented the children, was part of their family unit, and developed a parent-child relationship with them with Anker's consent and encouragement, it was an abuse of discretion not to move Ponsaran's petition forward to a full adjudication.

determine whether the petitioner has established all seven elements of de facto parentage. And although the petition must at least *allege* sufficient facts that, if proven, would establish all seven elements of de facto parentage, including the best interests element, the trial court is not required at the standing stage to *adjudicate* all seven elements.

Second, and as discussed, Anker's allegations about the children's best interests focused not on *whether* Ponsaran had developed a parent-child relationship with the children, but rather on Ponsaran's alleged motivations for developing that relationship and his alleged faults as a parent. But "the perfect parent is the exception and not the rule." Todd v. Sup. Ct., 68 Wn.2d 587, 600, 414 P.2d 605 (1966) (Rosellini, C.J., dissenting). And inevitably, in cases where a legal parent opposes a de facto parentage petition, the legal parent will call the petitioner's motivations, character, and parenting abilities into doubt. This, in addition to the reasons already discussed, is another reason that a dispute about the child's best interests should not be considered material to the issue of standing and should instead be adjudicated at trial. Here, the trial court erred not only by resolving that dispute at the standing stage, but also by dismissing Ponsaran's petition based solely on its resolution of that dispute.

We are cognizant that Anker successfully petitioned for a protection order against Ponsaran. But her response to Ponsaran's de facto parentage petition alleged only that Ponsaran "stalked my children at school after I asked him not to have any contact with me." A protection order—and particularly one sought to prevent contact between the very parties at the center of a de facto parentage

proceeding until a determination of parentage can be made—generally will be insufficient to warrant dismissal at the initial standing inquiry. Indeed, the WUPA itself now expressly contemplates that protection orders may be necessary in connection with de facto parentage proceedings, see RCW 26.26A.470(3), and the protection order ultimately entered by the court was expressly made subject to any further order resulting from the de facto parentage proceeding.

This is not to say that we take concerns about Ponsaran's alleged substance abuse and temperament lightly. But those concerns are not sufficient in this case, given the undisputed allegations regarding the facts material to standing, to deny Ponsaran (or the children) an opportunity for a full adjudication of parentage. Instead, they must, and should, be examined at trial after an opportunity to conduct discovery and investigation.[14]

As a final matter, Anker points out that "[w]hile it may have been the case that under the test in L.B., the question of best interest of the child was determined secondary to the determination of whether the de facto relationship existed, that is no longer the correct procedure now that the legislature has updated the UPA." Therefore, she contends, "[i]t is not accurate that the court must determine parentage first and then determine residential time/child support

---

[14] To be sure, there may be cases where the response makes such grave allegations about the petitioner that the court must consider the best interests of the child, as part of the initial inquiry, to ensure that proceeding to trial would not subject the legal parent to unwarranted and unjustified litigation. But those cases will not be typical, and this was not one of those cases. Generally, and given the weighty interests that children have in maintaining their relationships with those who have unequivocally parented them, disputes about the child's best interests should be tested at trial with the benefit of discovery and input from experts and third parties who have been involved in the children's lives.

based on the best interest of the child."  Anker is correct that under RCW

26.26A.440(4)(g), to be *recognized* as a de facto parent, the petitioner must

prove that continuing his or her relationship with the child is in the child's best

interest.  She also is correct that this requirement was not among the elements of

de facto parentage under L.B.[15]  But whether a petition can proceed to a full

adjudication is a different question than whether the petitioner should *ultimately*

be adjudicated a de facto parent.  Accordingly, it does not follow from the fact

that best interests now must be proven to establish de facto parentage that the

petitioner must also prove best interests merely to proceed to a full adjudication.

Although the petitioner must *allege* specific facts to establish the best interests

factor, those facts must, as discussed, be tested at trial if the petition is allowed

to proceed.

## Attorney Fees

Anker requests an award of attorney fees under RCW 26.26B.060, which

provides in relevant part, "The court may order that all or a portion of a party's

reasonable attorney's fees be paid by another party."  Anker contends that she is

entitled to an award of fees because she "has incurred significant attorney's fees

in connection with this de facto action . . . and has incurred even more in

connection with this appeal, which is causing a hardship for her and her

---

[15] The L.B. court adopted the following four elements for de facto parentage: "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature."  155 Wn.2d at 708.

children."

But Anker is not the prevailing party on appeal, and she cites no authority for the proposition that RCW 26.26B.060 supports an award of fees to a nonprevailing party based on hardship.  Cf. In re Marriage of Wendy M., 92 Wn. App. 430, 441, 962 P.2d 130 (1998) ("The attorney fee provision governing [parentage] proceedings, RCW 26.26.140 [now codified at RCW 26.26B.060] . . . does not require consideration of need or ability to pay in making an award."). Accordingly, we deny her request for attorney fees.

We reverse and remand for a full adjudication pursuant to RCW 26.26A.440(4).

WE CONCUR:

Andrus, A.C.J.